**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

|  |  |
|---|---|
| PODS Enterprises, Inc., | |
| Plaintiff, | |
| vs. | Case No.  8:12-cv-01479-JDW-MAP |
| U-Haul International, Inc., | **DISPOSITIVE MOTION** |
| Defendant. | |

**MOTION AND SUPPORTING MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), PODS Enterprises, Inc., ("PODS") seeks partial summary judgment on U-Haul International, Inc.'s ("U-Haul") First Counterclaim.  As demonstrated below, U-Haul fails to come forward with sufficient evidence upon which a jury could rely to meet its burden of proving that the PODS mark is generic.  In support of this Motion, PODS submits the Omnibus Declaration of Jason M. Sobel ("Ex.__").

I.      **PRELIMINARY STATEMENT**

U-Haul uses the PODS mark by displaying on its website the terms "U-Box pods," "moving pods," "storage pods," "storage and moving pods," "moving and storage pod," "pod," and "pods".  At present, there are over 300,000 uses of the term "pod" or "pods" on U-Haul's website.  PODS repeatedly asked U-Haul to cease using its trademark, which requests went ignored.  PODS brought the instant action asserting multiple claims for relief, including federal

and state claims for trademark infringement, unfair competition, dilution and for violation of Florida's Deceptive and Unfair Trade Practices Act.

U-Haul claims the term "pods" is "generic" and that it is free to use the PODS mark in any way it wishes.  U-Haul filed a counterclaim seeking a declaration that its use of PODS' brand name is lawful and seeking cancellation of PODS' trademarks.  To satisfy its burden of proving the PODS mark is generic, U-Haul must establish that the primary significance of the PODS mark to the actual or potential purchasers of portable storage containers in the moving and storage business is a common name and not a brand name.

Discovery is closed.  Expert reports have been exchanged.  U-Haul has no reliable, relevant evidence of the primary significance of the PODS mark to the relevant purchasing public.  The only direct evidence U-Haul offers regarding consumer perception—a "genericness" survey conducted by Dr. Wood, one of the 13 experts retained by U-Haul—is fundamentally flawed and therefore unreliable and inadmissible (see accompanying Motion and Supporting Memorandum To Exclude The Expert Testimony of Dr. Wendy Wood (the "Wood Motion").

Accordingly, U-Haul has no admissible evidence upon which a reasonable juror could conclude that the primary significance of the PODS mark to the relevant purchasing public is that of a common name for portable storage containers.  The Court should grant partial summary judgment for PODS on U-Haul's First Counterclaim.

## II.    BACKGROUND FACTS

PODS pioneered the portable moving and storage industry with the launch of its portable moving and storage business in 1998.  Sobel Ex. 1 at pp. 6, 20, 48.  PODS' founder and former CEO, Pete Warhurst, a retired fireman and paramedic developed the successful and groundbreaking portable moving and storage business that would later adopt the PODS

trademark for its goods and services.  PODS is an acronym for "Portable On Demand Storage." *Id.* at 6.  At the time the PODS mark was adopted no company in the moving or storage industry referred to their company or their products as a POD or PODS.  Only after PODS' significant efforts to associate its trademark PODS with portable storage containers did other competitors (including U-Haul) start to offer the same or similar services and, in some cases attempt to commandeer the goodwill of PODS by improperly using the PODS mark.

PODS obtained four federally registered trademarks for PODS on the principal trademark register, two of which are for the word "PODS" and are incontestable (Reg. Nos. 3011459 and 2365848), meaning that they may only be challenged on the basis that the mark is generic (and not on the basis that they are descriptive of the goods and services). 15 U.S.C. §§ 1064, 1065. Sobel Exs. 2 and 3.

PODS built its business quickly, establishing physical locations throughout most of the United States, coupled with considerable investment in the advertising, marketing and promotion of the PODS brand, all of which created a conscious connection in the mind of consumers between the PODS brand and PODS' goods and services. Since its founding, PODS has spent more than $150 million advertising, promoting and marketing its brand.  Sobel Ex. 4.  Today, PODS has approximately 150 locations nationwide serving more than 70% of the U.S. population (some locations are owned by individual franchisees).  Sobel Ex. 1; Sobel Ex. 5, Spowart Tr. 14:15-15:2, 132:18-133:18.

In 2007 PODS put itself up for sale.  Sobel Exs. 1, 6.  Fifteen companies, including the parent company of U-Haul (Amerco), placed initial bids to purchase PODS.  U-Haul's preliminary bid gained them access to PODS' confidential and proprietary business information.

3

Sobel Exs. **7,** 8 (*See* Responses to Request Nos. 1-10, 12-14, 16 and 31).  U-Haul never raised any issues concerning the alleged genericness of the PODS brand during the bid process.

In 2008, after having reviewed PODS' confidential and proprietary business information, U-Haul entered the portable moving and storage business with its U-Box offering. U-Haul invested no money towards advertising and promoting the U-Box brand other than a few limited tests of online AdWords purchases often referred to as "pay per click advertising."  Sobel Ex. 9. Sam Shoen Tr. 236:25-238:11.  A March 3, 2010 email to U-Haul's Chairman, Joe Shoen, indicated that the purchase of AdWords was a very effective way to drive traffic to the U-Haul website for renting the U-Box containers, but it was an expensive form of advertising as customer acquisition costs ranged from $350 to $400 per customer.  Sobel Ex. 10.

The U-Haul management team charged with developing the U-Box business (including the Chairman's son, Sam Shoen) were counseled in February 2010 that pay per click advertising:

> "although expensive was the one constant in receiving qualified leads every day … I would recommend optimizing the U-Haul site as discussed with all the important keywords. I hope that when this happens we will be #1 organically."

Sobel Ex. 11.  Additionally, U-Haul's Chairman received an alarming communication from a field operative in April 2010, stating:

> "I can't for the life of me figure out why the phones aren't ringing. Our competitors and partners around the country are telling me they are busy and their phones are ringing. When I search the internet (at least organically) our competitors are on the net and we are not. This I  believe is why the phones are not ringing.  Is there a plan? ..."

Sobel Ex. 12.

Based on these concerns, U-Haul immediately embarked upon its plan to misuse the PODS marks to achieve higher organic search result ranking. Specifically, in October 2010, U-Haul changed all title pages on its website to add the keyword "pods."  *Compare* Sobel Ex. 13,

4

PODS-0157513, *with* Sobel Ex. 14, PODS-0157514 (Archive.org's Wayback Machine printouts showing content of the U-Haul website on October 28, 2010 and October 30, 2010).

U-Haul, through its search engine optimization staff, determined that the PODS brand was the most important keyword to drive traffic to the U-box landing page of the U-Haul website. Sobel Ex. 15. Some within U-Haul were concerned that use of the term "pods" to describe the U-Box products would result in a legal dispute with PODS. Sobel Ex. 16. Prior to using PODS' mark on its website, however, U-Haul did not (1) conduct any consumer survey to determine whether the PODS mark was generic or (2) bring a petition in the USPTO to cancel the PODS marks, which it could have done prior to using the mark if U-Haul truly believed that the PODS mark was generic. 15 U.S.C. § 1064.

In or around January 16, 2012, U-Haul and their dealers were still very disappointed in the growth of the U-Box business and particularly upset about their organic search results not showing up on the first page of Google search results when consumers searched for the PODS brand. Sobel Ex. 17. U-Haul's Chairman directed U-Haul to immediately begin using the term "pods" on U-Haul's website. Sobel Ex. 18. Those orders were followed, which led to more than 300,000 additions of the terms "pod" and "pods" to U-Haul's website, which in turn has led to higher organic search ranking for U-Haul in Google search results for keywords or phrases including the term PODS, resulting in increased revenues and exposure for the U-Box business. Sobel Ex. 19.

A January 17, 2012 memorandum from Stuart Shoen (son of Joe Shoen and an employee of U-Haul), described U-Haul's decision to use the PODS mark on U-Haul's website as those of a "steel-eyed gunfighter" in contrast to other competitors of PODS who he described as "scared shopkeeps" for respecting the PODS trademark. Sobel Ex. 20. And U-Haul's illegal

"gunfighting" worked.  U-Haul's improper use of the PODS mark to game the system elevated the online presence of its U-Box portable storage business from the back pages of Google to a high ranking on the first page search results of Google, and its sales have increased dramatically, to the detriment of PODS and its mark.

### III.    U-HAUL'S ALLEGED EVIDENCE OF GENERICNESS

In addition to Dr. Wood, who performed a faulty genericness survey from an improper universe of people, U-Haul retained (i) linguist, Dr. Robert Leonard, who analyzed dictionary definitions and other documents preselected by U-Haul's counsel; (ii) Lynne Beresford, former Commissioner of Trademarks, who suggests that the USPTO made a mistake in registering the PODS mark; (iii) General Dail, a retired Lieutenant General of the US Army, who discusses the military's use of the term "pods"; (v) Randy Weissman, a PODS' competitor, who claims PODS is generic based on undocumented, non-specific discussions with unnamed customers; and (v) David Wallace, a CPA, with no training, experience or education in trademarks, who opines that PODS is used as a generic term within non-public financial documents of PODS.  PODS has concurrently filed *Daubert* motions to exclude the testimony of Dr. Wood, Dr. Leonard and Ms. Beresford.

### A.    DR. WOOD'S SURVEY AND TESTIMONY

As set forth more fully in the Wood motion (PODS' *Daubert* brief), Dr. Wood's online "genericness" survey is fatally flawed and should be excluded.  Among other errors, Dr. Wood defined the universe of people improperly, a fundamental and fatal methodological flaw rendering her results inherently unreliable and thus inadmissible.

6

## B.   DR. LEONARD'S TESTIMONY

In addition to the fact that linguist testimony in general is accorded little, if any, weight on the issue of genericness, Dr. Leonard's testimony is also unreliable because it does not even purport to analyze the question of the primary significance of the PODS mark to the relevant purchasing public.   As more fully set forth in PODS' *Daubert* brief, Dr. Leonard equates the PODS and U-Box containers as "(detachable) container(s) for the storage and transportation of goods" and opines that PODS is generic for such containers based solely on a limited set of documents provided to him by counsel for U-Haul. *See* Motion and Supporting Memorandum to Exclude the Expert Testimony of Dr. Robert Leonard (the "Leonard Motion") filed concurrently. Critically, Dr. Leonard never considered the relevant proportion of alleged generic uses of the term PODS to uses that referred to PODS as a brand among the relevant consuming public. *Id.* Dr. Leonard also did not focus on what would be indicative of the significance of PODS to the actual and potential purchasers of PODS' goods and services. *Id.*  In fact, Dr. Leonard readily admitted that he has no opinion on that issue.   Leonard Motion § I.C. (citing Sobel Ex. 41, Leonard Tr. 106:7-24).   Such failures render Dr. Leonard's testimony unreliable and irrelevant with regard to whether the PODS mark is generic.

Dr. Leonard also claims that PODS was generic when it was adopted in 1998.  However, he admitted that he did not look at usages of the term PODS in the moving and storage industry. Leonard Motion § I.D.  Instead, Dr. Leonard relies primarily on dictionary definitions provided to him by counsel that relate to aviation, aerospace and a nuclear submarine, all of which have no relation to whether in 1998 purchasers for moving and storing services believed the term PODS to be a common name.  Leonard Motion § I.G.

### C.   MS. BERESFORD'S TESTIMONY

Lynne Beresford is the former Commissioner of Trademarks for the USPTO, who like Dr. Leonard, relied solely on information provided to her by U-Haul's counsel. Ms. Beresford purports to testify about practices and procedures of the Trademark Office, but her expert report and testimony demonstrate that the real purpose of her opinion is to tell the jury that the PTO made a mistake when it registered the PODS mark. See Motion and Supporting Memorandum to Exclude The Expert Testimony of Lynne Beresford ("Beresford Motion") filed concurrently herewith. For the reasons fully set forth in the concurrently filed *Daubert* motion, Ms. Beresford's testimony is wholly unhelpful to the jury and should be excluded. *Id.*

### D.   GENERAL DAIL'S TESTIMONY

Mr. Dail is a retired Lieutenant General who served in the United States Army. Mr. Dail suggests that to military personnel, the terms pod, box, and shelter are synonymous.  Sobel Ex. 21, Dail Expert Report; Sobel Ex. 22, Dail Tr. 57:17-19.  However, Mr. Dail has no specialized knowledge of the commercial moving and storage business, has never heard of anyone trying to purchase or rent portable containers in civilian life, and confirms that his opinions are offered as a military expert and not as a civilian commercial expert.  Sobel Ex. 21; Sobel Ex. 22, Dail Tr. 111:23-24, 112:7-9, 82:3-5.  More importantly, how the military uses the word "pod" or "pods" has no bearing on how, or even whether, consumers understand the word PODS in relation to portable storage and moving containers.

### E.   RANDY WEISSMAN'S TESTIMONY

Mr. Weissman is the President of Storage Banc, a small competitor of PODS based in St. Louis Missouri.  Sobel Ex. 23, Weissman Expert Report at 2; Sobel Ex. 24, Weissman Tr. 19:9-10.  Mr. Weissman opines that PODS and U-Haul are not competitors, an opinion that directly

contradicts U-Haul's own pleadings.  While Mr. Weissman was not offered as an expert on how his customers refer to containers, he makes the gratuitous statement that he has talked with thousands of customers about his services, and that "most of them refer to our containers as "pods," "Storage Banc pods" or "Storage Banc mobile pods."   Sobel Ex. 23 at 15.   Mr. Weissman admitted, however, that his company used to advertise its containers as "pods," but stopped doing so after receiving a cease and desist letter from PODS.  Sobel Ex. 24, Weissman Tr. 58:9-22.  The fact that some Storage Banc customers may have referred to his containers as "pods" is not surprising in light of his company's prior trademark violations.

### F.   DAVID WALLACE'S TESTIMONY

U-Haul retained R. David Wallace to provide expert opinion and testimony relating to the use of the term 'PODS' in the audited financial statements and related internal management letters of PODS.  Sobel Ex. 25, Wallace Expert Report at ¶1.  Mr. Wallace's review of audited financial statements and internal management letters in search of allegedly generic uses of the PODS mark neither correlates with his particular specialized knowledge, nor assists the jury with understanding information outside of their normal background and experience. Moreover, non-public management letters and audited financial statements are irrelevant because they have no bearing on the significance of the PODS mark to the relevant purchasing public.

### IV.   ARGUMENT

### A.   LEGAL STANDARDS FOR SUMMARY JUDGMENT RELATING TO THIS MOTION

FRCP 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue of fact is "material" if it might affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). An issue of fact is

NY 75037789

"genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).

PODS, as the moving party, bears "the initial responsibility" of informing the court about the basis for the motion and evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Because U-Haul bears the burden to prove that the PODS mark is generic, PODS may satisfy this "initial responsibility" by showing the absence of evidence to support U-Haul's case or by showing that U-Haul will be unable to prove its case at trial. *Hickson Corp.*, 357 F.3d at 1260. While the validity of a trademark is a question of fact, courts routinely determine this issue on summary judgment. *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1525 (11th Cir. 1991); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 935 (7th Cir. 1986).

### i.      U-Haul Bears The Burden Of Proving The PODS Mark Is Generic

The registrations for the "PODS" marks (Reg. Nos. 3011459 and 2365848) are conclusive evidence of the validity of these trademarks. 15 U.S.C. § 1115; Sobel Exs. 2, 3, 26, 27**;** *Vision Ctr. v. Opticks, Inc.*, 596 F. 2d 111, 120 (5th Cir. 1979); *KP Perm. Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005) ("The general presumption of validity resulting from federal registration includes the specific presumption that the trademark is not generic.") The PODS registrations are incontestable, meaning that U-Haul may only challenge the validity of the PODS mark on the grounds that the mark is generic (and not on the basis that they are descriptive of the goods and services). 15 U.S.C. §§ 1064, 1065; *Park 'N Fly,*

*Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 205 (1985) Sobel Exs. 28, 29.  Accordingly, U-Haul bears the burden of establishing that the PODS mark is generic. *Vision Ctr.*, 596 F.2d at 120; *Retail Services, Inc. v. Freebies Publg.*, 364 F.3d 535, 542 (4th Cir. 2004) ("The presumption of validity flowing from trademark registration, therefore, has a burden-shifting effect, requiring the party challenging a registered mark to produce sufficient evidence to establish that the mark is generic by a preponderance of evidence.")

### ii.    Whether The PODS Mark Is Generic Depends On Its Significance To The Relevant Purchasing Public

A mark is generic when the primary significance of the mark to the relevant purchasing public is as a common name to identify goods or services as opposed to a brand name for those goods and services.  15 U.S.C. § 1064(3) (Trademark Clarification Act of 1984)  ("The primary significance of the registered mark to the relevant public…shall be the test for determining whether the registered mark has become the generic name of goods or services..."); *id.* ("A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service."); *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 641 (Fed. Cir. 1991) ("In sum, the 1984 amendment makes the test for genericness the primary significance of the mark to the <u>relevant public limited to the actual or potential purchasers of the goods or services</u>.") (emphasis added);  *See also Burger King Corp. v. Pilgrim's Pride Corp.*, 705 F. Supp. 1522, 1525 (S.D. Fla. 1988) *aff'd sub nom. Burger King v. Pilgrim's Pride*, 894 F.2d 412 (11th Cir. 1990) ("[t]he test of genericness…is the term's meaning to a usual buyer or other relevant members of the public."). "The 'primary significance test' is the law of the land." MCCARTHY ON TRADEMARKS § 12:11.

11

Put simply, the test for whether a mark is generic "inquires whether the primary significance of a term in the minds of the consuming public is the product or the producer." *Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 983 (3d Cir. 1993).  Some courts, when evaluating whether a mark is generic, use the following two-step inquiry: "First, what is the genus of goods or services at issue? Second, is the term sought to be registered or retained on the register understood by the relevant public primarily to refer to that genus of goods or services?" *H. Marvin Ginn v. Int'l Assoc. of Fire Chiefs, Inc.*, 782 F.2d 987, 990 (Fed. Cir. 1986); a*ccord Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980); *Welding Services, Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007). The reason for this inquiry is that "[g]enericness lies not in the term, but in the *use* of the term, '[a] word may be generic of some things and not of others: 'ivory' is generic of elephant tusks but arbitrary as applied to soap.'" *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 745 F. Supp. 2d 1359, 1369 (S.D. Fla. 2010) *quoting Soweco, Inc.*, 617 F.2d at 1183.

Accordingly, to analyze whether the PODS mark is generic, it is critical to focus on the goods and services, here portable containers for moving and storing and related services.  These goods and services define the relevant purchasing public, here, actual or potential purchasers of portable containers for moving and storing and related services. *Magic Wand*, 940 F.2d at 641.

Courts must be mindful, however, that a term may be generic amongst one group of persons, such as industry professionals, but not generic as to the relevant members of the public who actually buy the product or service. *See Burger King Corp.*, 705 F.Supp at 1525 (when denying JNOV because "chicken tenders" was not generic, court stated that "although there was evidence that the term 'tender' might be generic within the chicken industry, it was not generic among the general public…[and] [h]ere, such relevant members of the public would be the retail

12

consumers."). *See also Magic Wand*, 940 F.2d at 641(where the mark applied to automobile washing services, Trademark Trial and Appeal Board acted properly when it determined that the correct test was whether "touchless" was a generic name to customers of the washing services, not solely to operators and manufacturers in the industry). Likewise, a small part of the relevant purchasing public, such as industry insiders, "has limited probative value" when considering genericness. *Magic Wand, Inc.*, 940 F.2d at 641.

### B. U-HAUL HAS FAILED TO COME FORWARD WITH SUFFICIENT EVIDENCE FOR JURY TO FIND THAT THE RELEVANT PURCHASING PUBLIC BELIEVES PRIMARY SIGNIFICANCE OF PODS IS A COMMON NAME

Because U-Haul relies on expert testimony in support of its argument that PODS is generic, PODS' *Daubert* motions to exclude U-Haul's expert evidence are appropriate for the Court to consider in granting summary judgment on the issue of genericness. *See Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003) (requiring that evidence "assist the trier of fact" as mandated by *Daubert* is equally proper at the summary judgment stage as it is at trial).

### i. Dr. Wood's Survey Does Not Demonstrate Significance To Relevant Purchasing Public

Dr. Wood's online "genericness" survey is fundamentally flawed, rendering her results inherently inadmissible. *See* Wood Motion.

*First*, Dr. Wood surveyed an improper universe of respondents, a critical factor in assessing the reliability of a consumer survey, and one that cannot be remedied. Wood Motion § III.B.1. The relevant population for Dr. Wood's survey should have included consumers who are likely to use both moving <u>and</u> storage services, which are separate and distinct services. *Id.* Dr.

13

Wood, however, surveyed consumers who were likely to use only moving services.  Her survey did not include consumers who were likely to use storage services.  Dr. Wood's universe is therefore fatally under-inclusive.  *Id.*

Also, by including in her universe <u>all</u> respondents that had moved or planned to move, Dr. Wood failed to account for the fact that many people may move without utilizing the services of a moving company.  *Id.*  Her universe was therefore over-inclusive.  Dr. Wood, herself, admitted that respondents who did not use or plan to use a moving company should not be included in her universe.  *Id.* Incredibly, nearly 60% of the respondents in her survey told her that they did not use or plan to use a moving company, and yet she included them in the survey. *Id.*  That was also improper.  Dr. Wood also failed to screen the respondents to identify (and exclude) those individuals that had been previously exposed to U-Haul's misuse of the PODS mark.  *Id.*

*Second*, Dr. Wood improperly weighted her results.  Wood Motion § III.B.2.  Dr. Wood grouped the respondents into 5 groups: those that moved (1) one year ago or less, (2) around two years ago, (3) around three years ago, (4) around four years ago, and (5) five years ago or more and planned to move in the next twelve months.  Dr. Wood gave equal weight to consumers in each of the five groups, failing to account for the fact that people could have moved more than once during the four year period just before the survey was conducted.  *Id.* Thus, Wood improperly accorded greater weight to respondents who moved less recently and hence created an artificial population. *Id.*

*Third*, Dr. Wood's survey does not answer the question of whether the consuming public perceives the terms "pods" or "pod" to be brand names or common names.  Instead, Dr. Wood

included and relied upon additional "follow-up probing" questions that are directed at assessing secondary meaning, which is not even at issue.  Wood Motion § III.B.3.

*Finally*, Dr. Wood failed to employ proper quality control procedures in designing and conducting her survey.  More than 13% of the respondents gave inconsistent answers and should have been excluded.  Wood Motion § III.B.3.

The evidence that U-Haul offers in support of its genericness claim should not be considered.  Thus, U-Haul cannot meet its burden of proving the primary significance of the PODS mark to the relevant purchasing public.  Even assuming, *arguendo*, the Court admitted such testimony, for the same reasons discussed above, it is not sufficient evidence of genericness for a reasonable juror to rely on.

### ii.    Linguist Testimony Is Unreliable And Entitled To No Weight

Dr. Leonard's claim that PODS is generic, based solely on his analysis of documents and data preselected by U-Haul's counsel, is unreliable. *See* Leonard Motion. Dr. Leonard never considered the relevant proportion of generic uses of the term PODS to uses that referred to it as a brand among the relevant consuming public.  *Id.*  Dr. Leonard did not focus on what would be indicative of the significance of PODS to the actual and potential purchasers of PODS' goods and services. Even assuming the court could find some of his testimony reliable and helpful to the jury, as fully set forth in Plaintiff's Daubert motion, opinions on genericness from linguists are entitled to little to no weight.  Leonard Motion at III.C.3.  Dr. Leonard's opinions are not enough for a reasonable juror to conclude that the PODS mark is generic.

15

As set forth below, the underlying data and hearsay that Dr. Leonard relies on is also not sufficient evidence for a reasonable juror to rely on even without Dr. Leonard's unhelpful opinion.

### iii. The Dictionaries Leonard Relies On Do Not Reflect Understanding of PODS by Relevant Purchasing Public of Moving and Storage Goods and Services

Dictionary definitions may be relevant to determine genericness, but only to the extent they inform the jury as to the relevant inquiry, i.e., the primary significance to the purchasing public of the relevant goods and services. Dictionary definitions, however, "may not reflect word meaning among those persons who purchase the particular products involved." *Gilson on Trademarks*, § 2.05[3][c] at 2–112 (2007); *Berner*, 987 F.2d at 983; *Dorr-Oliver Inc. v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1017 (N.D. Ill. 1993). Instead, dictionaries "reflect lexicographical judgment and editing which may distort a word's meaning or importance." *Berner*, 987 F.2d at 983.

Here, the dictionary definitions relied on by U-Haul make clear that they are not indicative of the primary significance of the term PODS to the relevant purchasing public because the definitions arise out of the aerospace or military context, and have no bearing on the meaning of PODS to the relevant purchasing public in the moving and storage industry. The referenced dictionaries include:

- 1959 *NASA Aeronautical Dictionary* (An enclosure, housing, or detachable container of some kind as: A detachable compartment on certain **airplanes**…); Ex., 40, Expert Report of Robert Leonard, Ph.D. ("Leonard Rep.") ¶27;

- 1963 *Webster's Seventh Collegiate* ("A **streamlined** compartment under the wings or fuselage **of an airplane** used as a container (as for fuel)") (Emphasis added.); Leonard Rep. ¶28;

- 1973 *Dictionary of Weapons and Military Terms* (McGraw Hill) ("1. A **streamlined** housing for something carried externally **on an airplane or missile**. 2. A self-contained detachable compartment on an **airplane**.); Leonard Rep. ¶29;

- *American Heritage Illustrated Dictionary* of 1982 and 1987 ("A compartment for personnel or instrumentation that may be detached from the **spacecraft** carrying it."); Leonard Rep. ¶30;

- 1982 *Webster's Contemporary* ("A housing for an **aircraft** part that is mounted outboard"); Leonard Rep. ¶31;

- 1983 *Ninth New Collegiate Dictionary* ("…4: a **streamlined** compartment under the wings or fuselage of an **aircraft** used as a container (as for fuel); *broadly*: a protective container or housing <a **submarine with its reactor** in an external~) 5. a detachable compartment (as for personnel, a power unit, or an instrument) **on a spacecraft**"); Leonard Rep. ¶32;

- 1987 *Random House Unabridged Dictionary of the American Language* ("…4. a **streamlined** enclosure, housing, or detachable container of some kind: *an engine pod under the wing of an **aircraft*.*"); Leonard Rep. ¶33;

- 2012 unabridged online *Oxford English Dictionary* "A detachable or self-contained **compartment on an aircraft, [spacecraft] or other vehicle or vessel**, esp. one with a particular function. Also: any discrete unit, often having a **rounded** shape, which **forms** a separate or detachable **part of a larger structure**."); Leonard Rep. ¶59; Sobel Ex. 47, *Oxford English Dictionary* entry for "pod"; and

- 2012 *American Heritage Dictionary* ("An external or detachable housing, as for instruments or personnel, forming part of a **vehicle**."); Leonard Rep. ¶60.

Leonard Motion at § II.G.

As is evident, each of these definitions relate to parts of aircraft, space craft, or nuclear submarines, and are limited to being streamlined. The most recent definition is broader but is limited to a compartment that forms part of a larger structure, vessel or vehicle.  Because the dictionary definitions do not support his opinions, Dr. Leonard was forced to "interpret" the dictionary definitions.  In any event, no reasonable juror can conclude that these definitions describe the storage containers of PODS and U-Haul.

The *Burger King* court stressed the importance of reliance only on evidence that reflects the meaning to the relevant purchasing public even where the term is used generically in the same related industry. After trial, the *Burger King* court denied a motion for JNOV because although there was evidence that the term 'tender' might be generic within the chicken industry, it was not generic among the relevant purchasing public, the retail consumers. *Burger King*, 705 F. Supp. at 1525; *see also Magic Wand*, 940 F.2d at 641.  The same reasoning applies here.

> **iv.     The Court Should Disregard U-Haul's Selection of Other Generic Uses For The Same Reasons That Dr. Leonard's Testimony On The Subject Is Unreliable**

U-Haul also purports to rely on a handful of third party statements in support of its genericness arguments. Even assuming that U-Haul could admit unauthenticated, hearsay evidence of supposed generic uses to the jury, they are of no relevance for the same reason that Dr. Leonard's testimony is unreliable: they do not reflect the primary significance of PODS to the relevant purchasing public, and for this reason they are of such little weight they should be excluded.  *See Ty, Inc. v. Softbelly's Inc.,* No. 00 C 5230, 2006 WL 5111124, at *4 (N.D. Ill. Apr. 7, 2006) (excluding internet printouts of alleged generic uses of the term "Beanie" on the issue of genericness under rules 403, 802, 901).

The *Ty* Court also noted that proportionality matters, that is what proportion of websites and other sources use Beanie generally, as opposed to using Beanie in reference to a brand name, is what determines whether a mark is generic. *Id.* (noting that showdown over the number of printouts each party has to support their position is of little relevance and subject to exclusion under Rule 403).  Here, Dr. Leonard provided no evidence of proportionality.  In fact, he never set out to do so.  Leonard Rep. ¶22.  Thus, the sources in Dr. Leonard's report do not represent a balanced sample upon which an inference may be drawn as to the primary significance of the

18

term PODS to the relevant purchasing public.  Accordingly, they are not relevant, or of such little relevance, that they are inadmissible. In any case, no reasonable juror could discern the primary significance of PODS from a carefully curated set of references selected by counsel for U-Haul that were designed to only show purported generic uses.

Even more irrelevant are the undated telephone calls of U-Haul's own customers using PODS generically relied on by Dr. Leonard.  Leonard Rep. ¶¶ 108-109.  Essentially, U-Haul claims that PODS is a generic mark because after U-Haul began using the word "pods" on its website and its advertising materials, U-Haul's customers began calling U-Haul asking about "pods." This brand of circular logic proves infringement, not genericness. To permit U-Haul to rely on its own misuse as evidence of genericness would allow U-Haul to benefit from its own infringement.

### v.      Ms. Beresford's Testimony Is Irrelevant

Testimony concerning the practice and procedures of the trademark office are not relevant to the jury's determination of whether PODS is generic because it does not weigh the significance of the trademark to the relevant purchasing public.  It is well settled law that a trademark owner cannot abridge its rights by seeking registration with the PTO. *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 117 n.3 (1938); *California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985) (holding that registration or lack thereof neither expands or diminishes common law trademark rights).

To the extent that Ms. Beresford's testimony undermines the presumption of validity, it is not admissible for the reasons set forth in PODS's *Daubert* motion.  Beresford Motion § III.B. Ms. Beresford's opinions as to disclaimer practice and the supplemental register are irrelevant to the issue of genericness because none of the registrations at issue have a disclaimer, they are all

are on the principal register, and the registrations are incontestable.   Beresford Motion §
III.C.2.a.  Ms. Beresford's claim that other third parties used the term "pods" in their trademark
registration for <u>different</u> goods and services and disclaimed the term "pods" in such registrations
is also not relevant to whether the primary significance of the term PODS is a common name for
portable storage containers for moving and storage to customers for those goods.  *Id.*

Likewise, Ms. Beresford's other testimony concerning trademark registrations for
<u>different</u> goods and services where "pods" is included in the identification of goods and services
section of the registrations does not inform the jury about the significance of the PODS mark to
the relevant purchasing public. Beresford Motion § III.C.2.a.-b.  This testimony is irrelevant as
the identification of goods and services in the trademark registrations of PODS' competitors do
not use the PODS mark to describe their containers but instead use generic designations such as
"containers" to describe the goods and services.  Beresford Motion § III.C.2.b.  Ms. Beresford
admits that the use of the PODS mark in identification of goods and services is a violation of the
Trademark Manual of Examination Procedure Section 1402.09 (accordingly to Ms. Beresford "a
set of rules and procedures used by all examining attorneys…[and] cited approvingly by the
Supreme Court").  Sobel Ex. 51, Beresford Expert Report at 2.  After receiving Ms. Beresford's
report, U-Haul violated Section 1402.09 by amending U-Haul's description of goods and
services in pending trademark registrations to include the word "pods." Sobel Ex. 52, Beresford
Tr. 248:17-262:16; Sobel Exs. 30-32.   Such manufactured "evidence" is irrelevant to the
question of genericness because it does not inform the jury about the primary significance of the
PODS mark to relevant consumers.  Clearly, consumers planning to purchase moving and storing
services, do not first comb the records of the PTO before making that purchasing decision.

20

### vi.   Dail, Weissman and Wallace Testimony Carries No Weight On Significance to Relevant Purchasing Public

None of the "opinions" of Dail, Weismann or Wallace are informative on the issue of the primary significance of PODS to the relevant purchasing public.  Mr. Dail claims that in the military context, pod, box, and shelter are synonymous.  Sobel Ex. 22, Dail Tr. 57:17-19.  Mr. Dail has no specialized knowledge of the commercial moving and storage business, and confirms that his opinions are offered as a military expert and not as a civilian commercial expert.  *Id.* at 82:3-5, 111:23-24, 112:7-9.  How the military uses the word "pod" or "pods" has no bearing on how, or even whether, consumers understand the word PODS in relation to their portable storage and moving needs.

Similarly, Mr. Weissman, owner of a small competitor to PODS and U-Haul, makes the gratuitous claim that he has talked with thousands of customers about his services, and that "most of them refer to our containers as "pods," "Storage Banc pods" or "Storage Banc mobile pods."  Sobel Ex. 23 at 15.  Weisman has no records to substantiate these alleged discussions.  Sobel Ex. 24, Weissman Tr. 17:13-15.  Moreover, Weissman is a past infringer of the PODS mark, and his customer base is thus tainted, so it is not surprising that some of his customers may have referred to his containers as "PODS."

Finally, Mr. Wallace is a CPA.  He brings no specialized skill, training or experience that would in any way assist the jury because he is simply reading the English language, a skill that does not require expert assistance.  Moreover, neither Wallace or U-Haul have established (or even claim) that the relevant purchasing public reviews and/or considers non-public audited financial statements or related management letters in connection with deciding whether to rent a portable storage container from PODS or U-Haul.

In sum, the testimony of Dail, Weismann or Wallace, to the extent admissible at all, is not informative or probative on the issue of the primary significance of PODS to the relevant purchasing public.

**V.   <u>CONCLUSION</u>**

In conclusion, PODS respectfully asks this Court to grant summary judgment to PODS on the First Counterclaim, and any other relief this Court deems just and proper.

Date:  April 18, 2014

Respectfully submitted,

*/s/ Charles E. Cantine*

Jonathan B. Sbar, FBN 131016           Joseph Diamante
Raul Valles, Jr., FBN 148105             Charles E. Cantine
                                         Jason M. Sobel
ROCKE MCLEAN & SBAR, P.A.                Vivian Luo
2309 S. MacDill Avenue                   Admitted *Pro Hac Vice*
Tampa, FL 33629
Phone: 813-769-5600                      STROOCK & STROOCK & LAVAN LLP
Fax: 813-769-5601                        180 Maiden Lane
Email: jsbar@rmslegal.com                New York, New York
       rvalles@rmslegal.com              Phone: 212-806-5400
                                         Fax: 212-806-6006
                                         Email: jdiamante@stroock.com
                                                ccantine@stroock.com
                                                jsobel@stroock.com
                                                vluo@stroock.com

*ATTORNEYS FOR PLAINTIFF, PODS ENTERPRISES, INC.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

electronic mail to the following:

.

> R. Charles Henn, Jr.
> William H. Brewster
> Jessica A. Pratt
> Dennis L. Wilson
> KILPATRICK TOWNSEND & STOCKTON, LLP
> Suite 2800
> 1100 Peachtree St.
> Atlanta, GA 30309-4530
> Tel:  404-815-6500
> Email: chenn@kilpatricktownsend.com
>        bbrewster@kilpatricktownsend.com
>        japratt@kilpatricktownsend.com
>
> William P. Cassidy, Jr.
> JOHNSON & CASSIDY, P.A.
> 324 S. Hyde Park Avenue, Suite 325
> Tampa, Florida 33606
> Tel. 813-699-4857
> wcassidy@jclaw.com
>
> Leo R. Beus
> BEUS GILBERT PLLC
> 701 North 44th Street
> Phoenix, AZ 85008
> Tel: 480.429.3001
> Email:  lbeus@beusgilbert.com
>
> *Attorneys for Defendant U-Haul International, Inc.*

Date: April 18, 2014            *s/ Ellen G. Brier*
                                     Ellen G. Brier