## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PODS ENTERPRISES, INC.,

  Plaintiff/Counterclaim-Defendant,

vs.

U-HAUL INTERNATIONAL, INC.,

  Defendant/Counterclaim-Plaintiff.

CASE NO.: 8:12-cv-01479-JDW-MAP

**DISPOSITIVE MOTION**

### U-HAUL INTERNATIONAL, INC.'S
### MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

## I.    INTRODUCTION

The word "pod" and its plural, "pods" (collectively, "pod(s)") long have been generic for portable containers used in the transportation and storage of goods. In 1998, when Plaintiff PODS Enterprises, Inc. ("PEI") adopted the term "PODS" for its portable moving and storage pods (because it sounded more "container-ish" than PEI's prior name, "Portables"), the word "pod(s)" already was generic, and it remains generic today. "To allow a firm to use as a trademark a generic word . . . would make it difficult for competitors to market their own brands of the same product." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1315 (11th Cir. 2012). Generic terms therefore "cannot be appropriated from the public domain." *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007). Because PEI is attempting to do that here, all of its claims fail as a matter of law.

In addition to "pod(s)" being generic, U-Haul should be granted summary judgment on two other grounds: First, PEI's claims fail as a matter of law under the statutory defense of descriptive fair use (15 U.S.C. §§ 1115(b)(4) & 1125(c)(3)(A)) because U-Haul uses the term "pod(s)" in good faith to describe its goods and services. Second, PEI's claims for profits and

1

corrective advertising damages fail as a matter of law because PEI cannot demonstrate (i) any U-Haul profits attributable to the alleged infringement; (ii) a causal link between U-Haul's use of "pod(s)" and any economic harm suffered by PEI; or (iii) any evidence of actual confusion.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   The Term "pod(s)" Was Generic Long Before PEI Attempted to Appropriate it as a Mark

1.      Authoritative dictionaries from prior to 1998 define "pod" as a detachable container for the storage and transportation of goods or, more broadly, a "detachable container of some kind." Expert Report of Robert Leonard, Ph.D. ("Leonard Rpt.")[1] ¶¶ 24, 27-33. As early as 1959, NASA's *Aeronautical Dictionary* defined "pod" as "an enclosure, housing, or detachable container of some kind . . ."), and in 1987, the *Random House Dictionary* defined a "pod" as a "streamlined enclosure, housing, or detachable container of some kind . . . ." Roe Ex. 14 at UHI00043992, UHI00042050.

2.      Patents, trademark filings, manuals, magazines, and other publications used the term "pod(s)" as a generic term for detachable containers for the storage and transportation of goods well prior to 1998. Leonard Rpt. ¶¶ 34-40, 42-49; Roe Exs. 15, 125.

3.      Military servicemen and women have used the term "pod(s)" to refer to portable moving and storage containers since at least the 1970s. Leonard Rpt. ¶¶ 39-41; Roe Ex. 2 (Expert Report of LTG (Ret.) Robert Dail ("Dail Rpt.")) at 3-6; Roe Ex. 26 (Deposition of General Robert T. Dail ("Dail Dep.")) at 19:12-22.

4.      In 1987, long before PEI was founded, employees of Mover's World and its customers and portable container vendor "routinely" referred to portable containers as "steel

---

[1] The Expert Report of Robert Leonard, PhD is Exhibit 7 to the concurrently-filed Declaration of Shiveh R. Roe ("Roe Dec."). Exhibits to this declaration, including expert reports, deposition testimony, and documents, are referred to as "Roe Ex. __," unless otherwise noted.

shipping pod[s]." Roe Ex. 123.

  **B.**  **The Term "pod(s)" is Still Generic Today**

  5.  Current authoritative dictionaries continue to define "pod" as a detachable container for the storage and transportation of goods. Leonard Rpt. ¶¶ 58-63.

  6.  Hundreds of pages of industry websites, moving and storage advice websites, general websites, blogs, online classified ads, news articles, and social media sites show that the term "pod(s)" is understood by consumers as a generic term for detachable containers for the storage and transportation of goods. Leonard Rpt. ¶ 65; Roe Exs. 8-13, 18.

  7.  Numerous companies in the moving and storage industry use the word "pod(s)" to refer to portable containers. Leonard Rpt. ¶¶ 84-99.

  8.  PEI's own records document hundreds of generic uses of "pod(s)" by other companies. Roe Ex. 102.

  9.  Hundreds of news articles have used the term "pod(s)" generically. Leonard Rpt. ¶ 100; Roe Ex. 12.

  10.  U-Haul customers use "pod(s)" generically in reference to portable moving and storage containers. Leonard Rpt. ¶ 106; Roe Ex. 47 (Deposition of Joe Shoen ("J. Shoen Dep.")) at 17:4-11; Roe Ex. 48 (Deposition of Samuel Shoen ("S. Shoen Dep.")) at 129:10-130:18; Roe Ex. 120.

  11.  Nineteen third-party moving and storage companies confirmed that their customers also regularly refer to "pod(s)" when seeking portable containers. Roe Ex. 101.

  12.  Dozens of government statutes, municipal ordinances, and administrative and court opinions use the term "pod(s)" generically. Leonard Rpt. ¶¶ 114-18; Roe Exs. 16, 17, 122.

  13.  PEI has made generic use of the term "pod(s)," including on its websites, on its affiliates' websites, in its marketing materials and advertisements, and in other documents,

including audited financial statements, franchise documents, and on signage inside its portable moving and storage containers. Leonard Rpt. ¶¶ 119-33; Roe Ex. 24 (Expert Report of R. David Wallace, CPA, CFF ("Wallace Rpt.")) at 3, 8; *see also* Roe Exs. 19, 52, 66, 68, 82, 83, 84, 91, 93, 111, 124; Roe Dec. ¶¶ 34(c), 39(c), 40(g).

14.     PEI's expert, Chris Silver Smith, concluded the term "pod" is generic. Roe Ex. 32 (Expert Report of Chris Silver Smith ("Smith Rpt.")) ¶ 83; Roe Ex. 38 (Deposition of Chris Silver Smith ("Smith Dep.")) at 29:2-32:23, 39:17-25, 45:13-21, 79:4-16.

15.     Survey evidence also shows that a majority of relevant consumers considers the term "pod(s)" to be generic, and that only a small minority consider the term to be a trademark (*i.e.*, a source-identifier associated with only one company). Roe Ex. 25 (Expert Report of Wendy Wood Ph.D. ("Wood Rpt.")) ¶¶ 5-6.

### C.     PEI and its Claimed Mark

16.     In 1998, PEI adopted the name "PODS," which it claimed was an acronym for "Portable On-Demand Storage." Roe Ex. 97 (Deposition of Phillip Davis ("Davis Dep.")) at 23:18-24:3; *see also* Roe Ex. 85 (Deposition of Peter S. Warhurst ("Warhurst Dep.")) at 26:23-27:24.

17.     PEI adopted "PODS" based on the advice of a marketing consultant, who proposed the new name to sound more "container-ish" and "capture the essence of this new service." Roe Exs. 87, 99; Davis Dep. 22:22-24, 26:11-17.

18.     Peter Warhurst, founder of the company that became PEI, agreed that the word "pods" "gave [consumers] a better description of what it was we were trying to do." Warhurst Dep. 24:10-11.

19.     PEI's pods are containers used to transport and store goods. Dkt. 1, ¶ 18.

20.     PEI's pods are "detachable" containers. Specifically, PEI's containers are

attached to a flatbed truck, driven to the customer's home, and then detached via PEI's "Podzilla" hydraulic lift system and left in the customer's driveway. *See* Warhurst Dep. 106:23-108:19; Roe Ex. 75 (Deposition of George Spowart ("Spowart Dep.")) at 40:20-42:21.

21.     PEI does not own any federal or state trademark registrations for the singular term "pod." Spowart Dep. 234:15-17.

22.     PEI once owned a federal registration for "Put it in a Pod," but surrendered it for cancellation in 2006. Roe Ex. 113.

23.     PEI owns four federal trademark registrations for marks incorporating PODS (the "PEI Registrations"), which all recite January 9, 1998, as the date of first use. Dkt. 1, Exs. 1-4.

24.     Survey evidence shows that only 36% of the general consuming public recognizes the term "PODS" as a designation of source of the goods or services of a single company. *See* Roe Ex. 3 (Declaration and Rule 26 Report of Dr. Gerald L. Ford) ¶ 3.

### D.     U-Haul and its Moving and Storage Pods

25.     U-Haul is one of the nation's leading moving and storage companies. Among other goods and services, U-Haul offers moving and storage pods to customers looking for a convenient and flexible method to pack, move, or store their belongings. *See* Roe Ex. 103.

26.     U-Haul markets and sells its moving and storage pods under its registered trademarks U-HAUL®, U-HAUL U-BOX®, and U-BOX WE-HAUL®. *See* Roe Ex. 114.

27.     U-Haul's moving and storage pods fit on a trailer that is pulled behind a customer's vehicle to his or her home, and from which the pod can be detached. *See* Roe Ex. 103; Roe Ex. 46 (Deposition of Thomas William Kardys Jr.) at 30:8-32:13.

28.     U-Haul uses the term "pod(s)" generically, including in the phrases "moving pod(s)" and "storage pod(s)," to describe its containers and inform consumers of the nature of U-Haul's goods and services. *See* Roe Ex. 103; Smith Dep. 73:1-3.

29.     U-Haul never has used the term "pod(s)" as a trademark; instead, it always uses the term generically and in conjunction with U-Haul's own distinctive trademarks and brands. *See* Smith Dep. 83:15-17, 84:11-21, 85:5-6, 85:17-18.

30.     PEI's Vice President and General Counsel repeatedly acknowledged that U-Haul's use of the term "pods" was "generic or descriptive." Roe Ex. 104.

## III.   ARGUMENT

### A.     All of PEI's Claims Fail as a Matter of Law Because PEI Cannot Own Exclusive Rights in the Generic Term "pod(s)"

U-Haul is entitled to summary judgment because the term "pod(s)" is an unprotectable generic term for portable moving and storage containers, and was generic at the time of its adoption by PEI. *See Miller's Ale House*, 702 F.3d at 1321; *Welding Servs.*, 509 F.3d at 1358; *see also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §12:12 (4th ed. 2012) ("*McCarthy*").

#### 1.     Proving ownership of a valid trademark is a threshold issue.

PEI's trademark infringement, dilution, and related state-law claims all require that PEI establish exclusive trademark rights in the word "pods." *See* 15 U.S.C. § 1114(a) (2006); *Miller's Ale House*, 702 F.3d at 1317; *Klayman v. Freedom's Watch, Inc.*, 765 F. Supp. 2d 1348 (S. D. Fla. 2008) (defendant entitled to judgment on all Lanham Act claims, including dilution); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) (same analysis applies to Lanham Act claims and state law statutory and common-law claims). Therefore, genericness—whether proven *ab initio* (at the time of adoption) or through genericide (loss of rights in a term that once was protectable)—is a complete defense to all of PEI's claims. *Miller's Ale House*, 702 F.3d at 1321 (summary judgment for defendant appropriate where claimed mark is generic); *accord Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 542 (4th Cir. 2004).

6

## 2.    The genericness doctrine

"A generic mark is one which suggests the basic nature of the service." *Nassau v. Unimotorcyclists Soc'y of Am., Inc.*, 59 F. Supp. 2d 1233, 1237 (M.D. Fla. 1999) ("unimotorcycle" generic for one-wheeled motorized vehicle). "A claimed trademark is generic if it is the word . . . by which the good commonly is known." 11th Cir. Civ. Pattern Jury Instr. §10.4 (2013). "[T]rademark law prevents a person from removing a word from the general language and appropriating it for his own trademark." *Nassau*, 59 F. Supp. 2d at 1238.

### a)    Generic *ab initio*

If "the term at issue was regularly used [generically] before the plaintiff sought trademark protection," then the term was generic at inception—or *ab initio*—and cannot achieve trademark protection. *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 975-76 (8th Cir. 2006) ("brick oven" for pizza); *see also Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 810 (2d Cir. 1999) (acronym "HOG" generic for motorcycle); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 77 (7th Cir. 1977) ("light" or "lite" for beer); 2 *McCarthy* § 12:11.

This is true even if the plaintiff was the first to assert rights in the generic word: "The Court will withhold trademark protection for generic terms to avoid the creation of a monopoly in favor of the first provider of goods or services." *Nassau*, 59 F. Supp. 2d at 1237; *see also Kellogg v. Nat'l Biscuit*, 305 U.S. 111, 116 (1938) ("shredded wheat"). It is also true even if a plaintiff is able to show that some consumers have come to associate the generic term with a single source (i.e., "de facto secondary meaning"). *Welding Servs.*, 509 F.3d at 1358; *Schwan's*, 460 F.3d at 974. "[T]he repeated use of ordinary words functioning within the heartland of their ordinary meaning, and not distinctively, cannot give [a plaintiff] a proprietary right over those words, even if an association develops between the words and [the plaintiff]." *Boston Duck Tours, LP v. Super Duck Tours, LLC,* 531 F.3d 1, 21 (1st Cir. 2008) (internal quotation omitted).

7

b)      Genericide

Even if not generic at the time of their adoption, trademarks may become generic through

"genericide," which occurs when "the generic meaning becomes the primary or principal

significance of the designation to prospective purchasers." Restatement (Third) of Unfair

Competition ("Restatement") § 15 cmt. c (1995); *Schwan's*, 460 F.3d at 974; *see also* 15 U.S.C.

§ 1064(3) (providing for cancellation of registrations for marks that become generic). Though

such marks may have started as protectable, they become generic through common generic use.

*Nassau*, 59 F. Supp. 2d at 1238; *see also Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874

F.2d 95, 101 (2d Cir. 1989). Notable examples include *Bayer Co. v. United Drug Co.*, 272 F.

505, 511 (S.D.N.Y. 1921) ("aspirin") and *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321

F.2d 577, 579-81 (2d Cir. 1963) ("thermos"). Once a mark has become generic, it enters the

public domain and cannot be claimed exclusively by any single user. *Miller's Ale House*, 702

F.3d at 1317; *Nassau*, 59 F. Supp. 2d at 1238-39.

c)      Evidence of genericness

The public's understanding of a term as generic can be established by a variety of

evidence. *See* 2 *McCarthy* §12:13. Documentary evidence of genericness may include:

- Dictionary definitions, which "are significant evidence of genericness," *Harley-Davidson*, 164 F.3d at 810;

- Generic use by third parties, such as newspapers and magazines, which is "a strong indication of the general public's perception" that the word is generic, *Murphy Door Bed Co.*, 874 F.2d at 101;

- Generic use by competitors, *Colt Def., LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 706 (1st Cir. 2007) (use by "several" competitors probative of genericness);

- Generic use by the military, *Boston Duck Tours*, 531 F.3d at 8 ("duck tours" generic for tours using military vehicles originally called "DUKWs" (pronounced "ducks") or similar vehicles); *W.R. Grace & Co. v. Union Carbide Corp.*, 581 F. Supp. 148, 153-54 (S.D.N.Y. 1983) (prior military use properly considered in finding "barrier bag" generic);

- Plaintiff's own generic use, which "is powerful evidence," *Welding Servs.*, 509 F.3d at 1359; *Loglan Inst. v. Logical Language Grp., Inc.*, 962 F.2d 1038, 1041 (Fed. Cir. 1992);

- Generic use in patent language, *see, e.g.*, *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 407 (6th Cir. 2002); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir. 1986); *Colt Def.*, 486 F.3d at 707;

- Evidence that the plaintiff has sent numerous cease-and-desist letters to companies using the term generically, *Action Ink, Inc. v. Anheuser-Busch, Inc.*, No. 12-141, 2013 WL 3776548, at *6 (E.D. La. July 17, 2013) (60 cease-and-desist letters indicated prevalence of purported mark); *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 426 (S.D.N.Y. 2008), *aff'd*, 329 F. App'x 333 (2d Cir. 2009) (80 demand letters showed "there is no other reasonably available word to describe the meaning captured by the term"); and

- Use in governmental publications, such as statutes, *Miller Brewing*, 561 F.2d at 81.

In addition to documentary evidence, courts regularly rely upon expert testimony from linguists and consumer surveys to determine whether a term is generic. *See Miller's Ale House*, 702 F.3d at 1321; *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 745 F. Supp. 2d 1359, 1371-73 (S.D. Fla. 2010) (relying in part on expert testimony of linguist in granting summary judgment of genericness); *Steak n Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983, 993 (E.D. Mo. 2004) (testimony of historian and linguist "provides helpful guidance as to how people use the term 'steakburger' and the roots of this generic term.").

**B.       The Term "pod(s)" Was Generic *Ab Initio***

"[E]vidence of any significant generic usage is sufficient to preclude the recognition of trademark rights" in a term that was generic *ab initio*. Restatement § 15 cmt. c. Here, undisputed record evidence reflects significant generic usage of the term "pod(s)" for portable moving and storage containers long before PEI attempted to remove that word from the public domain in 1998. Roe Ex. 87. In a thorough review of the evidence produced in discovery, nationally recognized expert and professor of linguistics, Dr. Robert Leonard, confirmed that the term "pod(s)" was commonly understood to refer generically to portable moving and storage containers prior to 1998. Leonard Rpt. ¶¶ 49, 51.

Dr. Leonard identified several authoritative dictionaries which evidence significant generic usage of "pod(s)" well before 1998 for "detachable containers for the storage and transportation of goods." *Id.* ¶ 24. As but two examples, the 1987 *Random House Unabridged Dictionary of the English Language* defines "pod" as "a streamlined enclosure, housing, or detachable container of some kind," *id.* ¶ 33, and the 1983 *Merriam-Webster Ninth New Collegiate Dictionary* broadly defines "pod" as "a protective container or housing . . . a detachable compartment . . . ." *id.* ¶ 32. Because these dictionary definitions for "pod" describe the key elements of PEI's containers, they prove that "pod(s)" was already understood by the public as a generic word for detachable moving and storage containers of various types long before PEI's attempted appropriation of the term. *See* Roe Ex. 27 (Deposition of Dr. Leonard) at 240:22-241:3; *Miller Brewing Co. v. G. Heileman Brewing Co.*, Inc., 561 F.2d 75, 81 (7th Cir. 1977) (dictionary definitions need not exactly describe the specific goods or services at issue to establish that a term is generic; even specialized definitions sharing common key elements can establish genericness).

Dr. Leonard further identified evidence of significant third-party generic use of "pod(s)."

Leonard Rpt. ¶ 34. Dr. Leonard's review of newspapers and magazines identified common generic use of "pod(s)" for portable storage containers, including several articles in *Popular Mechanics* magazine from 1969-1979, *id.* ¶¶ 38, 42-43; a 1984 *Mechanix Illustrated* magazine ad, *id.* ¶ 44; two 1992 books, *id.* ¶¶ 45-46; and a 1997 article in *Smithsonian Magazine*, *id.* ¶ 47. All of these uses of "pod(s)" refer to detachable containers for the storage and transportation of goods, just as PEI uses the term today.

Lieutenant General (retired) Robert T. Dail, former Director of the Defense Logistics Agency, explains the military's significant generic use of "pod(s)" in connection with containers for the transportation of goods. Dail Rpt. at 3-6; Dail Dep. 19:12-16. For example, a 1977 U.S. Army manual documented a "Universal Military Pod" which could be transported by truck or helicopter and detached for on-site storage, just like a PEI pod. Leonard Rpt. ¶¶ 39-41.

 

Dr. Leonard also identified evidence of significant generic use of "pod(s)" in patent documents going back as far as 1949. *Id.* ¶¶ 35-37. One of these describes a "removable cargo pod" that can be loaded onto a truck, just as PEI's pods are today:

 

*Id.* ¶ 35. "All these patents show how well documented the generic use of pod and its plural pods is from the 1940s and 1950s." *Id.* ¶ 37.

Another example is a 1999 book—which reflects the common understanding of the term at the time—describing a fire department's use of "pods, which are large steel boxes similar to

overseas shipping containers . . . outfitted for specific tasks and transported via a truck that can hoist them up and roll them off at the scene of an emergency." *Id.* ¶ 64. This published generic use is *identical* to that made by PEI, U-Haul, and their competitors. *Id.*; Roe Ex. 88.

Similarly, numerous articles about the founding of PEI itself reflect the common understanding and significant generic use of the word "pod(s)" at that time. *See, e.g.*, Roe Ex. 86 at PODS-0139658 ("What if [Warhurst and a business partner] designed storage pods that could be delivered to peoples' homes, where customers could load them at their convenience and send them to a regional warehouse?"); *see also* Roe Ex. 90.

In light of all of this evidence demonstrating significant generic usage, Dr. Leonard concluded "that the words pod and pods were generic for 'detachable containers for the storage and transportation of goods' prior to PEI adopting PODS as a trademark in 1998." Leonard Rpt. ¶ 23. Dr. Leonard's expert testimony is undisputed: PEI submitted **no** linguist (or, for that matter, any other expert testimony) in rebuttal to Dr. Leonard's report.

C.     **Even If Not Generic *Ab Initio*, the Term "pod(s)" Has Become Generic Since Its Adoption by PEI**

Even assuming, *arguendo*, that "pod(s)" was not generic for portable moving and storage containers in 1998, the undisputed record evidence proves that the term today is understood by the public as a generic term for portable moving and storage containers.

1.     **Survey evidence proves consumer understanding that "pod(s)" is a generic term, not a trademark**

Surveys are "almost *de rigueur* in litigation over genericness" as "evidence of general public perception." *Miller's Ale House*, 702 F.3d at 1321-22. Although "there is no need for a survey if other evidence overwhelmingly proves that the disputed designation is a generic name," as is true here, courts expect surveys from both sides in genericness disputes. 2 *McCarthy* § 12:14.

12

Accordingly, U-Haul commissioned a *Teflon*-format survey to evaluate whether "pods" and "pod" are understood by the relevant consuming public to be generic terms or trademarks. *Id.* (noting *Teflon* format "has proven to be the most used and judicially accepted format to test a genericness challenge"). Dr. Wendy Wood, Vice Dean of Social Sciences at the University of Southern California, designed and oversaw the conduct of the survey, which showed that a majority of respondents considered the term "pod(s)" to be generic, and that only a small minority (barely more than 1/3) of respondents considered the term to be a trademark associated with only one company. Wood Rpt. ¶¶ 5-6. Dr. Wood concluded that "a majority of the relevant consumer universe regard 'pod' and 'pods' simply as the names by which containers for moving and storage are commonly known." Wood Rpt. ¶ 7.

PEI, on the other hand, <u>submitted no survey evidence on genericness whatsoever</u>, despite having ample opportunity to do so. A plaintiff's failure to present a genericness survey showing recognition of its claimed term as a trademark, particularly where the defendant presents a survey showing little such recognition, weighs against a finding that the mark is protectable. *See U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 526 (4th Cir. 2002).

The results of the only genericness survey in the record thus prove that relevant consumers regard both "pod" and "pods" as generic terms; only a small minority recognize either term as a trademark. This establishes that the terms are generic. *See, e.g.*, *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 822 (4th Cir. 2001) (affirming finding of genericness where only 41% of survey respondents associated the phrase at issue with a single source).

### 2. Dictionaries and third-party usage show that "pod(s)" is generic

In addition to the survey, the record evidence establishes that "pod(s)" is substantially used and understood generically. Dr. Leonard analyzed a wide range of contemporary sources and concluded that, "even assuming for the sake of argument only, that the words pod and pods

13

were not generic at that time PEI adopted its acronym trademark, the mark PODS has since

become generic via 'genericide.'" Leonard Rpt. ¶ 51.

a) <u>Dictionaries list "pod" as a generic term</u>

Authoritative dictionaries and similar sources today show the term "pod(s)" remains

generic for a "detachable container for the storage and transportation of goods." Leonard Rpt.

¶ 58. The 2012 *Oxford English Dictionary* defines "pod" as "[a] detachable or self-contained

compartment on an aircraft, or other vehicle or vessel." Leonard Rpt. ¶ 59. Similarly, the 2012

*American Heritage Dictionary* defines the term as "[a]n external or detachable

housing . . . forming part of a vehicle." Leonard Rpt. ¶ 60. These definitions clearly describe the

goods for which both parties use the term "pod(s)." *See* Roe Ex. 65 (Deposition of William H.

Merriman ("Merriman Dep.")) at 162:9-164:7; Spowart Dep. 48:25-49:11, 91:25-92:7.

b) <u>Third-party generic use</u>

Just as prior to 1998, the record contains compelling evidence of substantial present-day

third-party generic use of "pod(s)" for portable storage containers. "The term *pod* and its plural

*pods* are widely used as generic terms in *hundreds and hundreds* of pages of industry websites,

moving and storage advice websites, general websites, blogs, online classified ads, news articles,

and social media sites." Leonard Rpt. ¶ 65 (emphasis added); *see, e.g., id.* ¶¶ 66-99. This use

demonstrates the public's understanding of "pod(s)" as generic. *Nassau*, 59 F. Supp. 2d at 1238.

A 2006 *Tampa Tribune* article, for example, noted that "PODS has become, more or less,

the de facto term for portable storage units in America." Roe Ex. 90. Hundreds of other news

articles use "pod(s)" generically." Leonard Rpt. ¶¶ 100, 101-05; Roe Ex. 58 (Deposition of Ann

M. Lehman ("Lehman Dep.")) at 134:18-138:20 (acknowledging generic use in articles);

Merriman Dep. 174:10-177:8 (same); Roe Ex. 69.

Government uses, such as statutes, ordinances, administrative opinions, and court

14

decisions, also use the terms generically. Leonard Rpt. ¶¶ 115-18; Roe Exs. 100, 122. At least

one example, a West Virginia ordinance, provides a definition of the term that describes

precisely how PEI's pods have always been used: "*Portable storage container* (also commonly

known as a POD) is defined as a container designed and rented or leased for the temporary

storage of commercial, industrial, or residential household goods, that does not contain a

foundation or wheels for movement." Roe Ex. 16, at UHI00047516 § 5-9.

c) <u>Generic use by competitors</u>

"Scores of web pages from scores of companies that are involved in the do-it- yourself

moving and storage industries use or have used pod and its plural pods generically to identify

detachable containers for the storage and transportation of goods." Leonard Rpt. ¶ 84. Dr.

Leonard provides dozens of specific examples of such generic use. *Id.* ¶¶ 85-97, 99; *see also* Roe

Ex. 18. "These competitor websites demonstrate that competitors know that the term pod and its

plural pods are understood by their customers as generic terms meaning 'a detachable container

for the storage and transportation of goods' of exactly the sort provided by PEI, and by U-

HAUL." Leonard Rpt. ¶ 98. PEI's expert agrees that generic use by competitors demonstrates

that "pods" is generic. Roe Ex. 39 (Deposition of Russell S. Winer ("Winer Dep.")) at 87:16-22.

PEI is aware of widespread generic use by competitors. *See* Lehman Dep. 132:3-134:4;

Winer Dep. 126:10-24, 141:20-142:18; Merriman Dep. 62:4-22; Roe Exs. 102, 109. Even the

holding company that purchased PEI engaged in extensive generic use in pre-acquisition

communications with PEI. Roe Ex. 49 (Deposition of Simon P. Gregorich ("Gregorich Dep.")) at

127:24-131:24; Roe Ex. 51.

PEI's internal records show that over 400 of its competitors have used "pod(s)"

generically. Roe Ex. 102. PEI's efforts to appropriate this generic term included *hundreds* of

demand letters to other entities using "pod(s)" generically, many of which were not successful.

15

*Id.* These demand letters are of no consequence because, when a "mark has entered the public domain beyond recall, policing is of no consequence to a resolution of whether a mark is generic." *Hickory Farms, Inc. v. Snackmasters, Inc.*, 500 F. Supp. 2d 789, 800-01 (N.D. Ill. 2007) (internal quotations omitted); *see also OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 338 (4th Cir. 2009). PEI has also long been aware of competitors using "pod(s)" generically as a keyword search term on Google and other search engines. Roe Ex. 77 at PODS-0099596 (search strategy recognizing generic use by competitors).

d)      <u>Generic use by customers</u>

Moving and storage customers engage in significant generic use of the term "pod(s)." Leonard Rpt. ¶¶ 106-13; Davis Dep. 25:16-26:16; Roe Ex. 18; Spowart Dep. 76:8-12; Warhurst Dep. 88:2-14; Lehman Dep. 47:22-48:11, 51:2-52:2 (admitting that customers use "pod(s)" generically); Roe Ex. 54 (Deposition of Christopher W. Hachey ("Hachey Dep.")) at 112:12-15, 119:18-23; Smith Dep. 29:2-32:23, 39:17-25, 45:13-21, 79:4-16; Smith Rpt. ¶ 83 (PEI's expert Mr. Smith labels certain uses of "pod" as generic). Even the marketing consultant who advised PEI to adopt the "container-ish" term "pods" acknowledged: "I don't think that's to be debated that people are generically using the word." Davis Dep. 123:19-21; Roe Ex. 98.

PEI's own market research demonstrates that consumers understand the term generically. Roe Dec. ¶ 39(d). Its advertising agency even expressed concern about "'pod' or 'pods' being a category descriptor," Roe Dec. ¶ 39(e), and its Chief Marketing Officer testified that he "believe[s] that some people feel our brand describes this category because of its popularity," Spowart Dep. 211:23-24. Indeed, PEI was aware in 2009 that "[s]earch engines view PODS as a generic term v. a brand." Roe Ex. 105. In 2011, PEI's Sales and Marketing Committee noted that "[o]ur brand has become the category name." *Id.* at PODS-0147808.

16

### 3.      PEI's own generic use of the term "pod(s)"

Since its inception, PEI has extensively used the term "pod(s)" in a generic manner. *See*
Leonard Rpt. ¶ 119. Generic use "can be found on PEI's websites, PEI's affiliate websites, its
marketing materials and yellow pages ads, its internal document[s] and other external
documents." Leonard Rpt. ¶ 120; *see also* Merriman Dep. 20:8-23:13; Roe Exs. 66, 91-93.

In what is the Rosetta Stone of this case, PEI continues to this day to display posters
inside its pods making generic use of the term "pod(s)." Leonard Rpt. ¶¶ 127-28; Spowart Dep.
232:23-237:2; Warhurst Dep. 200:17-19; Roe Ex. 72 (Deposition of Christine Pierce ("Pierce
Dep.")) at 136:10-137:8; Merriman Dep. 168:24-171:23; Roe Ex. 84. On some of these signs, the
term "pod" is used generically in the phrases "CONTENTS CONTAINED IN POD MAY
SHIFT" and "PLEASE CHECK INSIDE THE POD FOR CHILDREN AND ANIMALS
BEFORE CLOSING THE DOOR." Winer Dep. 148:3-150:22; Roe Exs. 84, 121. The generic
use on these signs is irrefutable: the Spanish translation of "POD" provided on the sign,
"CONTENEDOR," *is simply the generic Spanish word for "container."* Lehman Dep. 54:16-
56:15. PEI's marketing expert and General Counsel both admitted this is generic use. Winer
Dep. 150:23-151:24; Roe Ex. 70 (Deposition of Aaron Parker ("Parker Dep.")) at 209:6-12.

PEI's employees and franchisees use the terms generically. *See* Spowart Dep. 216:2-12;
Pierce Dep. 102:11-15; Hachey Dep. 116:8-10, 118:2-5; Roe Ex. 81. The record contains
numerous emails and other communications by PEI employees using "pod(s)" generically. Pierce
Dep. 141:20-23; Merriman Dep. 108:16-110:11, 112:16-114:15, 117:1-118:10, 122:20-126:15,
127:7-129:11, 133:21-134:19, 135:23-137:3, 138:3-14, 139:16-145:14; Roe Exs. 67, 74. Even
PEI's operating and other manuals, and its franchise agreements and disclosures, contain generic
use of "pod(s)." *See, e.g.*, Roe Exs. 94, 95, 106.

PEI's internal generic use is not surprising. In sworn testimony in this and other cases,

PEI's founders, CFO, and other officers habitually used "pod(s)" generically. *See* Gregorich Dep. 174:21-24, 176:11-15; Warhurst Dep. 9:19-24, 36:3-4, 87:22-25, 92:6-101:3; Roe Ex. 89 at 121, 130, 131, 133, 141, 150, 151, 157, 160, 161, 178; Roe Ex. 107 at 98; Roe Ex. 108 at 40:22-41:2. PEI even directed its franchisees to engage in generic use, and then failed to correct that generic use for years. *See* Spowart Dep. 77:4-80:3; Merriman Dep. 30:5-21; Roe Ex. 76 at 106.

PEI also has used "pod(s)" generically on the internet. Indeed, a primary component of its e-commerce strategy is built around capturing consumers who use the term "pod(s)" generically. Spowart Dep. 187:3-189:3; Hachey Dep. 119:18-23; Roe Ex. 77 at 37. PEI's search-engine optimization and marketing efforts rely heavily on keywords including generic uses of "pod(s)," such as "portable pod," "moving pod companies," and "storage pods prices." *See, e.g.*, Hachey Dep. 124:3-7, 189:3-7; Roe Dec. ¶ 34(a). A substantial percentage of PEI's paid web traffic results from consumers using the terms generically. Hachey Dep. 158:13-15, 161:2-6, 164:21-23; Roe Dec. ¶¶ 34, 34(c).

PEI's primary website originally used the term "pod" generically in its domain name, www.putitinapod.com, and contained many examples of generic use. Spowart Dep. 216:15-226:24; Winer Dep. 175:4-177:7; Pierce Dep. 132:20-135:17; Roe Exs. 73, 82. Numerous examples of current and former PEI and affiliate websites, including previous versions of www.pods.com, make repeated generic use of the terms. Leonard Rpt. ¶¶ 121-25; Hachey Dep. 193:9-18; Roe Ex. 57. PEI's affiliate website, movingpods.com, "predominantly, if not exclusively, refers to pod and pods generically." Leonard Rpt. ¶ 121. The website even has included a generic *definition* of "pod": "A pod is a moving and storage container which can be brought to your home or office on demand." Roe Ex. 19 at UHI00048679.

A host of other PEI documents, including cease-and-desist letters sent by PEI's lawyers

18

to competitors, use the term "pod(s)" generically or identify third-party use as generic. Leonard Rpt. ¶¶ 129-32; Lehman Dep. 122:11-126:8; Gregorich Dep. 180:24-181:2; Pierce Dep. 102:11-15; Parker Dep. 61:17-25; Roe Exs. 53, 67, 71, 109; Roe Dec. ¶¶ 35(a)-(b).

PEI's advertising and sales presentations also use "pod(s)" generically. Leonard Rpt. ¶¶ 125-26; Spowart Dep. 141:14-147:6; Gregorich Dep. 183:25-186:2; Roe Exs. 52, 88, 111. Several PEI press releases have featured generic uses of "pod." Spowart Dep. 227:2-231:20; Merriman Dep. 160:6-162:19; Roe Exs. 68, 83. PEI's market research also uses the term "pod(s)" generically. Spowart Dep. 200:17-204:12.

PEI also conceded through its General Counsel that U-Haul is using the term "pod(s)" generically on the U-Haul website. Roe Ex. 104; Leonard Rpt. ¶ 133. Dr. Leonard found that "PEI's acknowledgment that using 'pod' to refer to a storage container is a generic use is ample confirmation of my conclusion that pod and its plural pods are understood by the public as generic terms." Leonard Rpt. ¶ 133. Such an admission demonstrates genericism. *See Schwan's*, 460 F.3d at 975 (plaintiff's head of relevant brand defined term generically).

Finally, PEI engaged in generic use of the term "pod(s)" in its audited financial statements. Gregorich Dep. 53:11-21, 66:21-24; Roe Ex. 50. U-Haul's expert CPA, David Wallace, analyzed those statements and identified numerous examples of PEI using the term "PODS" as "a generic term that refers to and is interchangeable with 'containers'" in reference to inventory and rental equipment rather than to intangible assets like trademarks. Wallace Rpt. at 3, 8. Materials prepared by Morgan Stanley for PEI's sale similarly used "pods" generically. *See* Roe ¶ 52. Such "[g]eneric use of pod and its plural pods found in materials that PEI itself controls is powerful evidence that the default understanding of pod in reference to a detachable container for the storage and transportation of goods is generic." Leonard Rpt. ¶ 134.

19

The compelling evidence of generic use by PEI and third parties renders irrefutable Dr. Leonard's conclusion that "[t]he language usage data . . . shows evidence of overwhelming generic usage of pod and pods both prior to PEI's adoption of PODS as a mark in 1998 and through to the present day." Leonard Rpt. ¶ 136.

### 4. The PEI Registrations do not demonstrate that its claimed marks are valid and protectable

Registration of a term constitutes only *prima facie* evidence of the term's protectability as a mark. *Retail Servs.*, 364 F.3d at 542. Evidence to the contrary—such as that the term is in fact generic—overcomes this evidentiary effect and shifts the burden to the party asserting the mark to demonstrate validity and protectability. *Id.* at 542-43; *Harley Davidson*, 164 F.3d at 811.

The decision by an examining attorney in the USPTO to grant registration to a claimed mark is given no deference. *Retail Servs.*, 364 F.3d at 543; *Boston Duck Tours*, 531 F.3d at 22. As the former Commissioner for Trademarks, Lynne Beresford, explains, courts and the Trademark Trial and Appeal Board do not rely on determinations of validity by examining attorneys because those attorneys have only limited resources, must rely only on personal knowledge, and do not have the benefit of a full record that includes testimony from linguists, consumer surveys, or other evidence. Roe Ex. 1 (Expert Report of Lynne Beresford) at 6-7. In short, the PEI Registrations do not refute the overwhelming evidence that "pod(s)" is generic.

### D. PEI's Claims Also Fail Because U-Haul Has Made "Descriptive Fair Use"

It is an absolute defense to claims under the Lanham Act if the defendant's use of the plaintiff's purported mark is "otherwise than as a mark . . . and used fairly and in good faith only to describe the goods or services of such party." 15 U.S.C. § 1115(b)(4); *see also* 15 U.S.C. § 1125(c)(3)(A). Affirming summary judgment, the Eleventh Circuit explained:

A fair use defense is established if a defendant proves that its use is (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. The "fair-use" defense, in essence,

20

forbids a trademark registrant to appropriate a descriptive term for its exclusive use and so prevent others from accurately describing a characteristic of their goods.

*Int'l Stamp Art, Inc. v. United States Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (internal quotations omitted). U-Haul can prevail on this defense even if the term "pod(s)" is not found to be generic. *Munters Corp. v. Matsui Am., Inc.*, 730 F. Supp. 790, 800 (N.D. Ill. 1989), *aff'd*, 909 F.2d 250 (7th Cir. 1990).

The record evidence is undisputed that (1) U-Haul uses the term "pod(s)" other than as a trademark (2) to describe its U-Box products. S. Shoen Dep. 121:1-25, 129:10-17, 134:20-22, 136:10-22, 155:12-23; Roe Exs. 61-64; Smith Rpt. ¶¶ 75, 83; Winer Dep. 34:13-22, 36:3-6, 39:5-7; Smith Dep. 28:17-29:18, 72:6-73:10, 74:20-75:21; Roe Ex. 45 (Deposition of Eugene P. Ericksen, Ph.D.) 119:3-13, 123:9-15; Spowart Dep. 219:18-23, 261:8-10; Pierce Dep. 144:19-145:3; Hachey Dep. 180:8-15.[2] *See Car-Freshner Corp. v. S.C. Johnson & Son*, 70 F.3d 267, 270 (2d Cir. 1995) (noting that prominent display of the defendant's own mark in conjunction with the term is evidence of descriptive, non-trademark use).

Similarly, no genuine issue of fact exists with regard to U-Haul's use of "pod(s)" in good faith. The test is "whether the alleged infringer intended to trade on the goodwill of the trademark owner by creating confusion as to the source of the goods or services." *Int'l Stamp Art*, 456 F.3d at 1274. Good faith "can be judged only by inquiry into [the defendant's] *subjective* purpose in using the [mark]." *Id.* at 1275 (citation omitted, emphasis added). Here, no admissible record evidence exists that U-Haul's subjective intent was to cause confusion through its use of "pod(s)"; rather, it is undisputed that U-Haul uses "pod(s)" because it believes that is the generic term its customers use when referring to portable moving and storage containers. S.

---

[2] One witness, PEI's general counsel, claimed that he had seen a press release with "pods" in capital letters, but no such document exists—U-Haul has produced all press releases incorporating "pod(s)," and none are in capital letters—and he could not remember any specifics. Parker Dep. 183:10-25, 184:1-2. His unsupported testimony violates Fed. R. Evid. 1002 and thus does not raise a genuine issue of fact.

Shoen Dep. 129:10-130:18; J. Shoen Dep. 17:4-11.

As further proof that U-Haul does not intend to confuse consumers, U-Haul uses the term in lower case letters along with the U-HAUL® trademark and orange color scheme, S. Shoen Dep. 135:20-22, 136:2-3, which PEI admits are "famous" trademarks. Spowart Dep. 138:4-5; Warhurst Dep. 233:1-6. Use of a descriptive mark in this way is "good-faith fair use." *Int'l Stamp Art*, 456 F.3d at 1275; *Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997); *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 796 (5th Cir. 1983). Finally, the lack of any admissible evidence of actual confusion shows that, if U-Haul had intended to create confusion, it was utterly unsuccessful in that endeavor.

In addition to the Eleventh Circuit in *Int'l Stamp Art, Inc.*, numerous courts have granted (or affirmed) summary judgment on the descriptive fair use defense under analogous circumstances. *See, e.g.*, *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 642 (7th Cir. 2001) (affirming summary judgment because plaintiff "failed to adduce evidence creating a genuine issue of fact" regarding good faith); *M.B.H. Enters., Inc. v. WOKY, Inc.*, 633 F.2d 50, 54 (7th Cir. 1980) (affirming summary judgment where defendant used plaintiff's mark descriptively along with defendant's trademark); *Ciociola v. Harley-Davidson Inc.*, 552 F. Supp. 2d 845, 864-65 (E.D. Wisc. 2008) (granting summary judgment because plaintiff adduced no evidence of defendant's *subjective* intent to confuse the public); *CG Roxanne LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1034 (N.D. Cal. 2008) (defendant's descriptive use of "Bottled at the Source" mark entitled to "complete defense"). Because PEI failed to adduce any evidence that U-Haul had a subjective intent to confuse consumers, U-Haul is entitled to summary judgment on its statutory affirmative defense of descriptive fair use.

**E.      PEI's Claim for U-Haul's "Profits" and Corrective Advertising Also Fail as a Matter of Law**

Separate from genericness or descriptive fair use, U-Haul is entitled to summary judgment on PEI's request for disgorgement of U-Haul's profits and corrective advertising.

The Lanham Act is not a strict liability statute. The owner of a trademark bears the burden of proving that the defendant's profits were attributable to unlawful use of the owner's mark, i.e., evidence of causation. *Optimum Techs., Inc. v. Home Depot USA, Inc.*, 217 Fed. App'x 899, 902 (11th Cir. 2007) (affirming denial of profits because plaintiff had "no evidence that any of [defendant's] sales . . . are attributable to its alleged infringement"); *Drew Estate Holding Co. v. Fantasia Distribution, Inc.*, No. 11-21900-CV-ALTONAGA, 2014 WL 1319328, *7 (S.D. Fla. April 1, 2014). "[A] profits award, premised upon a theory of unjust enrichment, requires a showing of actual consumer confusion—or at least proof of deceptive intent." *Optimum Techs., Inc. v. Home Depot USA, Inc.*, 78 U.S.P.Q. 2d 1801, at *3 (N.D. Ga. 2005) (citing *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1538 (2d Cir. 1992)).

Recognizing that PEI bears the burden of showing causation, and that it has no evidence of causation, PEI's damages expert, Walter Bratic, carefully skirts the issue by opining that PEI is entitled to the portion of U-Haul's revenues that "corresponds with infringing use of the pods mark." Roe Ex. 30 (Expert Report of Walter Bratic ("Bratic Rpt.")) ¶ 63. That is a clear evasion; no case stands for the proposition that the defendant's revenues must "correspond with" infringing use of a plaintiff's mark. Mere correspondence is not enough; plaintiff must have evidence of causation, and here, there is none.

When asked, "Do you know for a fact that any of the customers were confused as a result of U-Haul's use of the term pod or pods?," PEI's 30(b)(6) designee responded: "I don't know." Spowart Dep. 251:22-253:8. In fact, PEI produces only three pieces of evidence which it

contends demonstrate causation: a 2012 Accenture survey, a 2013 GE Capital report, and a 2012 DRI report. Bratic Rpt. ¶¶ 47-48.[3] These surveys provide only information regarding what proportion of consumers look at websites in connection with shopping. None of these surveys reference U-Haul's website or, more importantly, U-Haul's use of "pod(s)" on its website. To satisfy its burden of causation, PEI would need "non-speculative evidence" as to what proportion (if any) of U-Haul's profits were caused by U-Haul's use of "pod(s)" on its website. *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-cv-3181, 2010 WL 4065465, *7 (S.D. Tex. 2010). The record contains no such evidence and, as a result, U-Haul is entitled to summary judgment.

Corrective advertising requires evidence of actual confusion, plus either (a) past corrective advertising by the plaintiff or (b) plaintiff's financial inability to pay for such advertising in the future. *See Data Race, Inc. v. Lucent Tech., Inc*., 73 F. Supp. 2d 698, 725-26 (W.D. Tex. 1999); *see also Lurzer GMBH v. Am. Showcase, Inc*., 75 F. Supp. 2d 98, 101 (S.D.N.Y. 1998); *accord Thompson v. Fluid Controls*, 305 F.3d 1369, 1382 (Fed. Cir. 2002). PEI has no admissible evidence of actual confusion; the record is entirely devoid of any evidence that PEI has previously engaged in corrective advertising; and PEI's expert admitted that PEI was capable of funding its own corrective advertising campaign. Roe Ex. 36 (Bratic Dep.) at 49:21-50:1. Therefore, U-Haul is entitled to summary judgment on corrective advertising damages.

## IV.   CONCLUSION

U-Haul requests that this Court grant its motion for summary judgment on Counts I-VIII of PEI's Complaint, on U-Haul's Counterclaims I-V, and on PEI's claims for disgorgement of profits and corrective advertising. Additionally, because this is an "exceptional case" involving the effort to appropriate a clearly generic term, U-Haul requests that it be awarded its costs and

---

[3] A more detailed discussion of these three documents and the lack of any evidence of causation is contained in U-Haul's Motion to Exclude Bratic, filed concurrently.

attorneys' fees under 17 U.S.C. § 1117(a)(3).

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 3.01(j), U-Haul respectfully requests that the Court permit oral

argument, which should only require one hour of the Court's time.

Dated: April 18, 2014            RESPECTFULLY SUBMITTED:

*/s/ R. Charles Henn Jr.*
William H. Brewster (*pro hac vice*)
R. Charles Henn Jr. (*pro hac vice*)
KILPATRICK, TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
(404) 815-6500
(404) 541-3240 (facsimile)
Email: bbrewster@kilpatricktownsend.com
Email: chenn@kilpatricktownsend.com

William P. Cassidy, Jr.
Fla. Bar No. 332630
JOHNSON & CASSIDY, P.A.
324 South Hyde Park Avenue, Suite 325
Tampa, FL 33606
(813) 352-1042
(813) 671-0758 (facsimile)
Email: wcassidy@jclaw.com

Leo R. Beus (*pro hac vice*)
BEUS GILBERT PLLC
701 North 44th Street
Phoenix, AZ 85008-6504
(480) 429-3000
(480) 429-3100 (facsimile)
Email: lbeus@beusgilbert.com

*Attorneys for U-Haul International, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been served on counsel of record via the Court's
CM/ECF system.

*/s/ R. Charles Henn Jr.*

25
