PODS ENTERPRISES, INC.,

 Plaintiff/Counterclaim-Defendant,

vs.                                  CASE NO.: 8:12-cv-01479-JDW-MAP

U-HAUL INTERNATIONAL, INC.,

 Defendant/Counterclaim-Plaintiff.

## U-HAUL INTERNATIONAL INC.'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DR. RUSSELL WINER AND MEMORANDUM IN SUPPORT

U-Haul International, Inc. requests that this Court exercise its gatekeeping function and exclude the expert reports and related testimony of Dr. Russell S. Winer, which fail to satisfy *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the requirements of "reliability" and "helpfulness," because of missing or unreliable methodologies.

## I.    INTRODUCTION

U-Haul uses the generic terms "pod" and its plural, "pods" (collectively, "pod(s)"), including phrases like "moving pod(s)" and "storage pod(s)," with its U-Box® brand. A host of empirical evidence confirms that consumers view "pod(s)" as being generic, and also that U-Haul's use does not create any confusion or dilution with plaintiff's ("PEI") claimed mark.

As part of its efforts to seek at least $179.3 million dollars, PEI offered the Expert Report of Dr. Winer ("Winer Report"), the Rebuttal Expert Report of Dr. Winer ("Winer Rebuttal"), and later the Supplemental Report of Dr. Winer ("Winer Supplemental Report"), on a range of general topics, including "branding" and "brand value."[1] But his commentary is not anchored to

---

[1] The Winer Report ("Winer Rpt") is Exhibit 33, the Winer Rebuttal is Exhibit 34, and the Supplemental Winer Report ("Supplemental Winer Rpt.") is Exhibit 35 to the concurrently filed Declaration of Shiveh R. Roe. Exhibits to this declaration are referred to as "Roe Ex. __," unless otherwise noted.

specific methodologies or the facts of this case, is without any empirical basis, and is unhelpful to the trier of fact. As described below, this is hardly new for Dr. Winer—a 2013 decision held that his work in another trademark case was unreliable and insufficient to raise an issue of material fact sufficient to defeat a summary judgment motion.

In this case, Dr. Winer's reports and testimony suffer from the same defects and more, including the following:

(1) even after readily admitting that "I am not qualified nor have I been asked to provide an opinion on the likelihood of confusion between PODS' and U-Haul's offerings," he then attempts to do just that by offering opinions on consumer confusion based on an incomplete assessment of relevant factors (that is either selective or ignores elements altogether), and without any surveys or other empirical evidence;

(2) he opines on genericness despite testifying that he is not using the relevant "principal significance" test, and without any framework for or analysis of generic use by consumers;

(3) he testified that "famous" is not a term used in marketing and that his use is only in a "lay sense," but then claims to provide expert testimony that "fame" is associated with PEI's purported trademark (notwithstanding the lack of any survey or other reliable or empirical evidence);

(4) he opines as to the strength and value of PEI's brand, as well as alleged harm to that brand, using a construct that ignores certain factors and facts, which yields unreliable opinions not supported by the evidence; and

(5) stepping entirely outside of his purported marketing expertise, he performs damages calculations with unreliable methods and inaccurate data.

Because Dr. Winer's opinions are not supported by any reliable methodology, are not based on any reliable empirical data, and are not helpful to the trier of fact, they fail to satisfy the stringent requirements of *Daubert*, and therefore, those opinions—including regarding (1) confusion, (2) genericness, (3) fame, (4) the value of PEI's brand, and (5) damages—should be excluded.

## II.     BACKGROUND

### A.     The Winer Report and *Novalogic*

Rule 26(a)(2)(B)(v) requires that an expert report include a "list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Despite that clear rule, the Winer Report did not have any such list. *See, e.g.*, *Huckaby v. Travelers Property Cas. Co. of Am.*, 2011 WL 4954249, at *2 (M.D. Ga. Oct. 18, 2011) (excluding report for failure to include list of cases, among other things). U-Haul's counsel twice requested the list. Roe Ex. 40. When PEI finally supplemented the Winer Report, that list was incomplete. *See id.* When questioned at his deposition, Dr. Winer again failed to identify all such cases. Roe Ex. 39 (Deposition of Dr. Winer ("Winer Dep.")) at 27:15–17.

U-Haul determined that the list was missing one case, a very recent trademark infringement case in which Dr. Winer's opinions—substantially similar to those offered in this case—were excluded. The omitted case was *Novalogic, Inc. v. Activision Blizzard*, No. CV 12-4011-JFW (SHx), 2013 WL 3234863 (C.D. Cal. June 18, 2013). Just six months before Dr. Winer submitted his report in this case, the *Novalogic* court held that Dr. Winer's report and opinions were unreliable and entitled to no weight because they suffered from the same critical defects that permeate his reports and opinions in this case: (1) proffering unqualified analyses and opinions on the legal questions at issue; (2) failing to demonstrate the specific facts he relied on in forming his opinions; (3) failing to undertake any research; and (4) failing to demonstrate how his expertise was reliably applied to the facts of the case. In so holding, the court did not

mince words, concluding that "Dr. Winer has failed to demonstrate the specific facts that he relied on in forming [his] opinions" by failing to address "the products he examined, how he conducted the examinations, and importantly," whether he had reviewed the relevant trademarks in the context in which consumers view them. *Id*. at 8. Further, because Dr. Winer had not "undertaken any research or considered the origins of" the phrases or logos underlying the trademark dispute, the *Novalogic* court could not "determine if there [was] an appropriate or proper basis for Dr. Winer's assumptions about the facts or the products in this case." *Id*. at 8.

With respect to application of his purported expertise to the case at hand, the *Novalogic* court found that

> Dr. Winer has failed to demonstrate, other than in a very general and conclusionary fashion, how his . . . expertise has been reliably applied to the facts of this case. Specifically, Dr. Winer fail[ed] to explain how his experience leads to the conclusions he reaches, why that experience is a sufficient basis for his opinion, and how that experience is reliably applied to the facts of this case.

*Id*. The *Novalogic* court then concluded that

> Dr. Winer's statements regarding consumer choice and cross-branding lack foundation, are not supported by evidence in this case, and, most importantly, **do not appear to be based on any discernible methodology.** Instead those opinions are based on broad notions and theories of branding and Dr. Winer's testimony on those issues is essentially a compendium of his personal beliefs that are irrelevant to [the] issues in this case.

*Id*. at 8–9 (emphasis added). Finally, with respect to Dr. Winer's opinions on likelihood of confusion, the court held that

> Dr. Winer's attempt to offer an opinion as to a significant potential for confusion in the marketplace based on the *Sleekcraft* factors[2] is both unreliable and not helpful to understanding the evidence or determining a fact at issue in this case. As Dr. Winer candidly admits, his analysis is incomplete because he does [not] have detailed information on a number of the *Sleekcraft* categories to render such an opinion.

---

[2] The court was referring to the Ninth Circuit's likelihood of confusion factors in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979).

*Id.* at 9. Ultimately, the court granted the defendants' motion for summary judgment because there was no genuine dispute as to any material fact. *Novalogic*, 2013 WL 3234863 at 14.

Dr. Winer's report in *Novalogic* proffered opinions virtually identical to his opinions in this case. *See id.* at 8. Indeed, both reports purport to opine on the "Fundamentals of Brands and Their Trademarks . . . Brand Identity . . . Ways in Which Brands Create Value for the Consumer . . . Ways in Which Brands Create Value for the Company . . . International Expansion . . . Building and Maintaining Brand Equity . . . [and] How Trademarks . . . Reinforce the Brand." *Compare* Roe Ex. 44 (Declaration of Russell S. Winer in *Novalogic*) *with* Winer Rpt. Some portions of the Winer Report are little more than a copy-and-paste job. For example, in his initial report in this case, Dr. Winer writes:

> While I am not qualified nor have I been asked to provide an opinion on the likelihood of confusion between PODS' and U-Haul's offerings, the *Sleekcraft* factors . . . closely follow the types of information that I, as a marketing expert, would consider in assessing whether U-Haul's misappropriation of PODS' trademark or variations thereof is likely to affect perceptions of the PODS brand in the minds of consumers and concomitant purchasing behavior of consumers.

Winer Rpt. at 56. In his *Novalogic* report, Dr. Winer wrote:

> While I have not been asked to provide an opinion on the likelihood of confusion between [Plaintiff's] products and the offending products, the *Sleekcraft* factors closely follow the types of information that I, as a marketing expert, would consider in assessing whether [Defendants'] misappropriation of [Plaintiff's Mark] is likely to affect perceptions of [Plaintiff's] brand in the minds of consumers and concomitant purchasing behavior of consumers.

Roe Ex. 44.

As discussed below, Dr. Winer committed all the same critical errors that he made in *Novalogic*, in addition to other errors, and Dr. Winer's opinions should be excluded. *NFL Props., Inc. v. Prostyle, Inc.*, 16 F. Supp. 2d 1012, 1018 (E.D. Wis. 1998) (excluding expert's survey due to numerous flaws for which courts previously criticized him).

## B.    U-Haul's Experts

By way of background, and as discussed below, U-Haul proffered a series of expert reports that (directly or indirectly) rebut the general and conclusory contentions in the Winer Report, including the following:

- Phillip Johnson conducted a survey showing that relevant consumers are not likely to be confused during Internet searches by U-Haul's use of "pod(s)." Roe Ex. 6 (Report of Philip Johnson ("Johnson Rpt.")) ¶¶ 46–50.

- Hal Poret conducted a survey demonstrating that consumers encountering the U-Haul U-Box web page are not likely to be confused about any affiliation with PEI. Roe Ex. 23 (Expert Report of Hal Poret ("Poret Rpt.")) at 16–17.

- Dr. Gerald Ford executed a survey demonstrating that "PODS" is not "widely recognized by the general consuming public as a designation of source of the goods or services of the mark's owner," and thus is not a "famous" mark, as defined by the Trademark Dilution Revision Act, 15 U.S.C. § 1125(c)(2)(A). Roe Ex. 3 (Declaration and Rule 26 Report of Dr. Gerald L. Ford ("Ford Rpt.")) ¶¶ 4, 23.

- Dr. David Neal conducted a survey showing that the U-Haul website is not likely to "call to mind" the alleged PODS mark (and thus unlikely to dilute that mark). Roe Ex. 20 (Expert Report of David Neal Ph.D. ("Neal Rpt.")) ¶¶ 4, 41–42.

- Dr. Robert Leonard performed a comprehensive linguistic analysis that investigated the meaning and usage in American English of "pod(s)," concluding that (1) "pod(s)" was generic for detachable moving and storage containers at the

time adopted by PEI; and (2) "pod(s)" is generic today. Roe Ex. 7 (Expert Report of Robert Leonard Ph.D.) at 9, 32.

- Dr. Wendy Wood's survey demonstrates that a majority of consumers understand "pod(s)" to be generic and not a brand name for goods or services coming from a single source. Roe Ex. 25 (Expert Report of Wendy Wood Ph.D.) at 3–4.

### C.    The Winer Rebuttal Report

The Winer Rebuttal covers main two issues, including (1) alleging that Dr. Wood's survey is flawed, despite Dr. Winer's own admissions that contradict his major criticism and no empirical evidence of the impact of the alleged flaws; and (2) attempting to rebut opinions by damages expert Scott Phillips with the conclusory assessment that Mr. Phillips "misapplies marketing principles" when assessing PEI's lack of harm and damages. Winer Rebuttal 5–6. Dr. Winer also offers "general comments" regarding PEI's policing of its purported mark and genericness that are flawed for, and should be excluded for, the same reasons as the related opinions in his original report.

Because the Winer Rebuttal's discussion of Scott Phillips' report on damages does not contain anything more than the same unqualified opinions he offered in the Winer Report, they are disposed of for the same reasons listed below, namely that Dr. Winer is admittedly not qualified to opine on damages or likelihood of confusion, and his opinions with respect to the impact of U-Haul's actions on PEI's brand are flawed and unsupported. U-Haul does not discuss his opinions on Scott Phillips separately, but those opinions also should be excluded.

### D.    The Winer Supplemental Report

The Winer Supplemental Report (served on April 9, 2014) covers two issues: (1) Dr. Winer opining that the fame survey conducted by Dr. Ericksen, Dkt. No. 135-02, supports Dr. Winer's claim in his initial report that "PODS" is well-known; and (2) attempting to recalculate

damages and to rebut damages opinions by Jonathan Hochman.[3] Supplemental Winer Rpt. at 4–7. As shown below, Dr. Winer admittedly is not an expert on fame and cannot simply repeat Dr. Ericksen's opinion under the guise of offering his own expert opinion. Dr. Winer also admits he is not an expert on damages, nor is he an expert on the pricing of online advertisements. As such, the Winer Supplemental Report is fatally flawed for those same reasons as his other two reports.

### E.     The Joachimsthaler Rebuttal

Dr. Erich Joachimsthaler examined the Winer Report, together with other materials, and concluded, *inter alia*, that PEI's purported mark is not famous, is a generic term, and that U-Haul's use is not likely to cause confusion. *See* Roe Ex. 5 (Rebuttal Report of Dr. Erich Joachimsthaler ("Joachimsthaler Rebuttal")) at 5–6. Dr. Joachimsthaler also concluded that "Dr. Winer in this case lacks usage of the proper frameworks and models and their application to case facts," despite Dr. Winer's admissions in his own writings that a proper framework and application are necessary. *See id.* at 72.

## III.    ARGUMENT

### A.     The *Daubert* Standard for Admissible Expert Evidence

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which reflects the standard of reliability discussed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the resulting body of case law. *See, e.g.*, *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). In applying Rule 702 and *Daubert*, "the trial court must perform a 'gatekeeper' function designed to ensure that any and all expert testimony is both relevant and reliable." *Unleashed Magazine, Inc. v. Orange County, Fl.*, 2008 WL 4304883, at *9 (M.D. Fla. Sept. 16, 2008); *see also McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

---

[3] The Expert Report of Jonathan Hochman ("Hochman Report") is Exhibit 4 to the Roe Declaration.

The party offering expert testimony h

as the burden of laying the proper foundation for admission, which must be shown by a preponderance of the evidence. *See McCorvey*, 298 F.3d at 1256; *Unleashed Magazine, Inc.*, 2008 WL 4304883, at *9. PEI has the burden to show that (1) Dr. Winer is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which Dr. Winer reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise to understand the evidence or determine a fact in issue. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001). The Eleventh Circuit refers to these prongs as (1) "qualification," (2) "reliability," and (3) "helpfulness"; although some overlap exists, they remain distinct concepts to be individually analyzed, *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), because failure of one factor is dispositive. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (trial court must determine both validity of the expert's qualifications and reliability of the proposed testimony).

In assessing qualification, reliability, and helpfulness, this Court should consider the following non-exclusive list of factors identified by the Supreme Court in *Daubert*: (1) whether the expert's methods or techniques can be or have been tested; (2) whether the technique, method, or theory has been subject to peer review and publications; (3) whether the known or potential rate of error of the technique or theory when applied is acceptable; and (4) whether the technique, method, or theory has been generally accepted in the scientific community. *See Unleashed Magazine*, 2008 WL 4304883, at *9. Dr. Winer's expert testimony fails to satisfy both the reliability and helpfulness prongs, and in certain areas, Dr. Winer lacks the qualifications necessary to render the opinions he gives.

**B.      Dr. Winer's Opinions Are Not Reliable or Helpful to the Trier of Fact**

   **1.      Dr. Winer's opinions on consumer confusion are unqualified, unreliable, and unhelpful.**

Expert testimony is not admissible if it cannot "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. of Evid. 702(a). Such testimony must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

At the outset, Dr. Winer admits that "I am not qualified nor have I been asked to provide an opinion on the likelihood of confusion between PODS' and U-Haul's offerings . . . ." Winer Rpt. at 56. Dr. Winer then goes on to address the likelihood of confusion factors, as articulated by the Ninth Circuit, since he largely was just copying from his report in the *Novalogic* case in the Central District of California, and to conclude that confusion exists (thereby essentially proffering a baseless legal opinion).

As evident from Dr. Winer's deposition, his confusion analysis did not follow or comport with the *Sleekcraft* factors, much less the likelihood of confusion factors used by the Eleventh Circuit. *See, e.g.*, *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007) (listing seven-factor test). For instance, the Eleventh Circuit's first factor is the strength of or type of mark. *Id.* at 648. In conducting that analysis, courts analyze conceptual strength (*i.e.*, whether it is arbitrary or fanciful, suggestive, descriptive, or generic), as well as commercial strength. *See Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1182 (11th Cir. 1985). A mark that is "merely descriptive" is conceptually weaker than a mark that is coined. *Id.* Dr. Winer's analysis of strength, however, was different; in fact, he testified that his marketing

analysis does not include the conceptual strength. Winer Dep. 167:19–168:16. Similarly, Dr. Winer testified that his analysis of the second factor, the similarity of the marks, was based on the terms out of context, rather than as they are seen in the marketplace (e.g., Winer Dep. 171:3–19)—the Lanham Act, however, requires the latter. *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (11th Cir. 1979) ("A mark must be viewed in its entirety and in context. It is the overall impression that counts.").

Although Dr. Winer expressly states that he is not offering an opinion regarding likelihood of confusion, he then does just that using "marketing analysis" different from and inconsistent with the legal test used by the Eleventh Circuit. As a result, his opinion not only would be unhelpful to the trier of fact, it would be misleading.

Dr. Winer's unsupported generalizations are stark because plaintiffs asserting trademark infringement usually offer evidence of confusion by way of a well-designed consumer survey. Dr. Winer himself is aware of the unreliability of testing consumer perceptions without a properly conducted survey. *See* Roe Ex. 43 (Declaration of Russell S. Winer in *Tiffany v. Costco*) ("[U]se of a random sample would be essential to performing a scientifically valid test of whether any substantial part of the population of [relevant consumers] made purchase decisions as a result of 'confusion' or other factors."). Dr. Winer could have conducted a survey so that he had empirical evidence to support his claims, but he did not. Winer Dep. 165:1–166:8. Otherwise qualified persons have not been permitted to opine on confusion without empirical evidence of consumer confusion. *See Patsy's Italian Rests., Inc. v. Banas*, 531 F. Supp. 2d. 483 (E.D.N.Y. 2008) (refusing to allow branding expert with 25 years of experience in brand marketing, publications on the subject in the *Wall Street Journal* and *New York Times*, and ample relevant academic activities to opine on the likelihood of confusion without survey evidence).

Instead of unsupported opinions regarding confusion, plaintiffs asserting trademark infringement usually offer evidence of consumer confusion by way of a well-designed consumer survey. *See* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:158 (4th ed. 2012) ("*McCarthy*") ("The usual procedure is . . . to hire a survey taker to run an appropriate survey."). In a 1999 trademark case, the Eleventh Circuit noted in dicta that "[t]his Circuit, however, has moved away from relying on survey evidence." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1341 n. 5 (11th Cir. 1999) (citing *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1167 n. 10 (11th Cir. 1982)). However, in *Safeway Stores*, the Eleventh Circuit, again in dicta, simply declined to consider the survey evidence because evidence of infringement was "sufficiently clear even without whatever additional evidence of likelihood of confusion the survey might provide, such a discussion would be of little value," especially where the district court found both parties' surveys problematic. *Safeway Stores, Inc.*, 675 F.2d at 1167 n. 10. In *Safeway Stores*, the Eleventh Circuit in no way indicated that surveys were generally problematic or not useful in trademark cases.

Since *Frehling*, numerous courts in this circuit have relied on survey evidence or otherwise noted that survey evidence is acceptable or even expected in trademark infringement cases, including this court. *E.g.*, *World Triathlon Corp., Inc. v. Dawn Syndicated Prods.*, 2007 WL 2875456, at *8 (M.D. Fla. Sept. 28, 2007) (granting summary judgment for defendant, noting plaintiff failed to present any evidence of actual confusion and no survey evidence) (Whittemore, J.); *see also CCA and B, LLC v. F + W Media Inc.*, 819 F. Supp. 2d 1310, 1320 (N.D. Ga. 2011) (noting that a survey might help plaintiff to establish a likelihood of confusion at trial); *Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, 2011 WL 4005454, at *7 (S.D. Fla. Sept. 8, 2011) ("That Plaintiff failed to produce survey or other quantitative evidence

renders Plaintiff's uphill battle even steeper."); *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, 2010 WL 3075318, at *9 (N.D. Ga. 2010) (denying motion to exclude defendant's expert witness testimony related to likelihood of confusion survey); *Auction Mgmt Solutions, Inc. v. Manheim Auctions, Inc.*, 2008 WL 4452362, at *6 (N.D. Ga. Sept. 30, 2008) (holding plaintiff failed to prove likelihood of confusion and noting the lack of survey evidence); *Sun Protection Factory, Inc. v. Tender Corp.*, 2005 WL 2484710, at *6 (M.D. Fla. Oct. 7, 2005) ("To show actual confusion, a plaintiff may rely on . . . consumer surveys.").

Indeed, the Eleventh Circuit itself recently recognized that surveys are helpful in trademark infringement and unfair competition cases. *See Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1320 (11th Cir. 2012) ("Unlike a random consumer survey, these statements [regarding genericness] fail to offer evidence of general public perception.") (citing with approval 2 *McCarthy* § 12:14 ("Consumer surveys have become almost de rigueur in litigation over genericness.")).

Although Dr. Winer admits that (i) he is not qualified to opine on consumer confusion (Winer Rpt. at 56); (ii) neither he nor PEI conducted a survey on likelihood of confusion (Winer Dep. 56:12–14), and (iii) he has no direct knowledge of any actual confusion (Winer Dep. 56:1–9),[4] he still opines that confusion is likely. *See, e.g.*, Winer Rpt. at 67. As the *Novalogic* court ruled, "Dr. Winer's attempt to offer an opinion as to a significant potential for confusion in the marketplace based on the *Sleekcraft* factors is both unreliable and not helpful to understanding the evidence or determining a fact at issue in this case." *Novalogic*, 2013 WL 3234863, *9. "[T]estimony based solely on [Dr. Winer]'s personal opinion on the issue of likelihood of

---

[4] Dr. Winer claimed to have information about one instance of actual confusion that he heard about from PEI. Winer Dep. 55:12–56:9. In addition to being inadmissible double hearsay, that individual has since been deposed, and admitted that he was not, in fact, confused. *See* Roe Ex. 96 (Deposition of Matthew Carroll) at 8:19–9:1 ("Q. Did you believe there was a connection between the pods company and the U-Haul company? A. At no time. . . . Q. Did you think that the companies were working together? A. No, ma'am.").

confusion should not be permitted because it would usurp the jury's role in making fact determinations." *Patsy's Italian Rests., Inc., v. Banas*, 531 F. Supp. 2d. at 486; *see also New Century Fin., Inc. v. New Century Fin. Corp.*, 2005 WL 5976552 (S.D. Tex. Nov. 29, 2005) (granting motion to exclude because expert failed to offer any empirical evidence in support of opinion that confusion was likely). Accordingly, whether he is opining on consumer confusion or any other consumer perceptions, Dr. Winer's testimony should be excluded.

> ### 2. Dr. Winer's opinions about the level of customer involvement in the moving and storage industry, or anything else based on outdated research provided by PEI, are unreliable and should be excluded.

In his unqualified analysis of the Ninth Circuit's likelihood of confusion test, Dr. Winer tersely concludes that consumers are more likely to be confused because the moving and storage category is one of "low involvement." Winer Rpt. at 57. Low involvement product categories are those in which the purchase poses an insignificant risk to the consumer, for example, soft drinks, chocolate, or everyday household staples like soap. *See* Joachimsthaler Rebuttal at 21. Decision making for soda and candy bars requires "little to no cognitive effort invested by consumers to evaluate alternatives," and, thus, occurs in a relatively automatic fashion. *See id.* Specifically, Dr. Winer states that "research has shown that nearly half the number of people researching moving services spend two hours or less researching before making their rental purchase." Winer Rpt. at 57.

First, Dr. Winer provides no methodological framework for deciding involvement, and no basis for assessing what is (or is not) an insignificant amount of time for consumers to spend researching moving services. *See* Joachimsthaler Rebuttal ¶¶ 144–49. Among other things, he offers no comparisons to other industries, or any other measure for determining the significance of research time. And, in fact, the research Dr. Winer relies on does not support his opinions— according to that data (and the direct corollary to the above-quoted opinion that "nearly half"

spend "two hours or less")—more than half of people spend two hours or more researching moving services. *See* Roe¶ 58. That research time is hardly analogous to the effort expended in purchasing a candy bar, and this Court should find that too great an analytical gap exists between the data and the opinion offered, rendering the opinion inadmissible. *See Gen. Elec. Co. v. Joinder*, 522 U.S. 136, 146 (1997).

Second, because PEI withheld current research, the data Dr. Winer relied on is outdated. Here, Dr. Winer used DRI Research from 2010 (despite relying on 2011 research (reported in 2012) everywhere else in his report). *Compare* Winer Rpt. at 57 n. 192 *with* Winer Rpt. at 35 n. 113, 36 nn. 114 & 117, 46 nn. 159–61, 47 nn. 162–65. The 2011 research shows that a large percentage of moving and storage consumers took *days* to decide which service to use. *See* Roe¶ 59. Moreover, DRI research from October 2013—which PEI did not provide to Dr. Winer— revealed evidence that moving/storage is a high involvement category. For example, customers not only do lots of research, but they actually contact multiple companies before making a decision. *See* Winer Dep. 102:17–19 (49% moving), 105:23–25 (66% storage); Roe ¶ 28(b); Joachimsthaler Rebuttal at 25–26. Dr. Winer admits he would have liked to have had this information available to him, and that if PEI had provided it to him, he would have relied on 2013 data instead of data from earlier years. *See* Winer Dep. 111:5–11.

Finally, Dr. Winer did not sufficiently research the level of consumer involvement in the moving and storage category to adequately determine what level of involvement there truly is, nor does he have experience in the area. *See id.* 188:5–10 (admitting that he is not "familiar with any research in the marketing literature in which somebody has studied the perceived risk attached to moving."); *id.* 189:11–12 (consumer involvement is "not my area of research, so I haven't written about it."). However, had Winer bothered to consult the very journal he sits on

the editorial board of (the Journal of Marketing), he would have discovered the article "When Old is Gold: The Role of Business Longevity in Risky Situations," which studied moving and associated risks. *See id.* 186:21–187:23. The authors described owners of common household items such as electronics, antiques, and art pieces who had to decide on a moving company for a move to a new city as being in a "high-risk situation." *See* Roe Ex. 42 at 98. The higher the risk, the higher the involvement. Winer Dep. 178:23–179:4, 184:4–185:19. Accordingly, Dr. Winer's opinions related to customer involvement should be excluded as unreliable.

**3.     Dr. Winer's unqualified opinions on genericness are unreliable, unhelpful, and should be excluded.**

Dr. Winer also offers unqualified, unreliable, and unhelpful opinions with respect to whether "pod(s)" is generic. *See, e.g.*, Winer Rpt. at 51; Winer Rebuttal at 32–35. Dr. Winer, however, is admittedly not an expert on whether words are generic, and has no special qualifications for offering those opinions:

> Q.     Have you provided expert testimony in any matter as to whether a term is generic?
> A.     No I have not.
> Q.     Have you, in your academic research, done any work on the subject about the examples of misuse and what level of misuse rises to be sufficient to influence whether or not a term is generic?
> A.     No.

Winer Dep. 247:3–21; *see also id.* 236:11 ("I'm not a linguist.").

Dr. Winer's testimony also confirmed that he had no methodology for assessing genericness:

> Q.     By what method do you assess whether the examples of misuse of  the PODS name do, indeed, rise to a level that they could influence whether or not it's viewed as a generic term?
> A.     I'm using my expertise in marketing and branding to draw that judgment.
> Q.     And if somebody else, who were an expert in marketing and branding, wanted to draw a judgment, how would they replicate what you have done to reach your opinion?

> A. They would have to take a look at the way that U-Haul has used the term
> pods on its website, and other misuses of the term, and draw their own
> conclusions.
>
> Q. And other than referring to marketing and branding, is there a particular
> model or formula that could be applied to help them make that
> determination?
>
> A. Not that I know of.

*Id.* 249:18–250:12. Because his opinions are not based on any methodology whatsoever, much less a reliable and repeatable one, Dr. Winer's testimony must be excluded. *See Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion.").

Dr. Winer also testified that his expert opinions are not based on any particular percentage of understanding by consumers. Winer Dep. 44:5–14; 76:8–78:6. In other words, he most certainly is not assessing the "primary significance" of the word for consumers. But that is the relevant standard that must be applied. *Miller's Ale House, Inc.*, 702 F.3d at 1319, 1322 (11th Cir. 2012); *see also Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938) ("It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer."); 2 *McCarthy* § 12:6 ("The result of the primary significance rule is that majority usage controls.").

Even if it was permissible for Dr. Winer to offer general, personal opinions regarding genericness, those opinions still must be tied to facts. Dr. Winer, however, clearly relied on alleged "facts" of which he had no real knowledge, that were not true, and/or whose falsity he could have uncovered if he had done any research. One of the more egregious examples is Dr. Winer's opinion that PEI properly polices use of the claimed PODS mark. For example Dr. Winer states that PEI has been "successful in more than 250 cease and desist actions against a variety of competitors, charitable organizations, media writers, and local governments." Winer

Rpt. at 48–49. At his deposition, however, Dr. Winer did not even remember the purported methodology he used to come up with his opinion. Winer Dep. 144:14–20, 145:3–11 ("I don't recall exactly how I got to 250. I don't remember the methodology.").

As another example, Dr. Winer says that "I understand that having been made aware of erroneous posters inside some of the containers, PEI has taken immediate steps to remove them." Winer Rpt. at 51. Yet, he admitted that he had not seen the posters and did not know how many existed. *See* Winer Dep. 147:21–152:25. Other examples of PEI's generic use of "pod(s)" were shown to Dr. Winer, such as screenshots from PEI's primary website between 1999 and 2007, putitinapod.com, which was riddled with generic references. However, Dr. Winer claimed that "[t]his is the first time I've ever seen this. As I said, with the earlier report, I would like the opportunity to study it in more detail. The answer to your question is no [this use of 'pod' is not a branded use]." Winer Dep. 176:11–17.

Dr. Winer failed to review the relevant and available facts before opining on the issue of genericness. He declined to review the Leonard Report (which offers an expert linguistic analysis of consumer understanding of "pod(s)") in rendering his opinion. Winer Dep. 153:1–14. Nor did he conduct any research on the origin or use of "pod(s)." *Id.* 70:6–14. This very issue came up in *Novalogic*:

> Dr. Winer has not undertaken any research or considered the origins of the phrase 'Delta Force' . . . or that the phrase . . . predated Plaintiff's game and [has] a real world significance other than as the name . . . of Plaintiff's game franchise. Without such a showing, the Court cannot determine if there is an appropriate or proper basis for Dr. Winer's assumptions about the facts or the products in this case.

*See Novalogic*, 2013 WL 3234863, 8. Here, Dr. Winer again offers opinions on a purported mark without having done any research and with admittedly no expertise in genericism.

### 4. Dr. Winer's opinions as to the fame of PEI's purported mark are unsupported, unreliable, and should be excluded.

The Winer Report refers to the "fame" associated with the claimed "PODS" mark (Winer Rpt. ¶¶ 107–08, 126), but does not explain what is meant by "fame," and does not opine that the mark is "famous" (as required by state and federal dilution statutes). *See* Joachimsthaler Rebuttal at 5 n.1 ("It is not clear from Dr. Winer's report that he ever reaches an opinion that PODS is a famous mark. He refers to it as 'well known' (¶ 107) and a 'business asset' (¶ 105). He also mentions 'fame associated' with the PODS brand name (¶ 108). But he carefully avoids stating that the claimed PODS mark is 'famous.'").

When asked whether "famous" was a term of art in marketing, Dr. Winer testified that the concept did not exist in marketing, that the word was not even widely used, Winer Dep. 69:3–10, and that he was offering only his "lay opinion" regarding "fame," *id.* 81:2–13, 141:8–14. As such, his opinion is not one of an expert and, further, is not helpful to the trier of fact because, if it does not address fame under federal or state dilution law, it does not address an issue present in this case.

Had Dr. Winer conducted a proper survey among "the general consuming public of the United States," he would have learned (as Dr. Ford did) that the term PODS is not famous. Ford Rpt. ¶¶ 4, 23. Instead, Dr. Winer relies on the research by a PEI vendor (DRI) tracking aided and unaided awareness of "PODS." Winer Rpt. at 47. But that research was not structured to identify whether the word was a designation of source. *See* Ford Rpt. ¶¶ 19–20; *see* Joachimsthaler Rebuttal ¶ 148. Moreover, PEI did not provide Winer with the October 2013 data, which shows decreasing awareness. Winer Dep. 97:17–98:20; Roe ¶ 28(b).

Dr. Winer pointed generally to PEI's advertising as support for his conclusion that PEI's claimed mark has fame, but he offers no methodology for analyzing those expenditures. *See*

Joachimsthaler Rebuttal ¶¶ 83–86. In fact, those expenditures are far below what generally is understood as necessary to create a "famous" mark. *Id.* Because he is unable to offer his own opinion on "fame," Dr. Winer belatedly attempts to rely on Dr. Ericksen's survey, (Winer Supplemental Rpt. 4–5), but Dr. Winer cannot act as a mouthpiece for Dr. Ericksen when he has no expertise on the issue. *In re ConAgra Peanut Butter Prods. Liab. Litig.*, 2011 WL 6960816, at *2 (N.D. Ga. Apr. 7, 2011) ("Rule 703 does not allow [an expert] to rely on the findings of an expert in a different field."). Because Dr. Winer's methodology is unreliable, his opinions on "fame" should be excluded.

> **5.      Dr. Winer's opinions as to alleged harm to PEI's claimed mark are also unreliable and should be excluded.**

The Winer Report consists of generalizations untethered to the facts of this case and ultimately, therefore, constitutes pure speculation. For instance, Dr. Winer claims that, "[t]he investments that companies make building their brands result in a sustainable brand asset whose value can be quantified as 'brand equity.' In fact, many firms' most valuable assets are their brands." Winer Rpt. at 7. However, Dr. Winer did not actually evaluate whether PEI's brand was in fact its most valuable asset:

> Q.      Do you believe that it is true that PEI's most valuable asset is its brands?
> A.      Yes, I do.
> Q.      Have you done any work to quantify that?
> A.      To quantify the value of PEI's brands?
> Q.      Yes.
> A.      No, I have not.
> Q.      Are you aware of any work that's been done in an effort to quantify the value of PEI's brands?
> A.      No, I am not.

Winer Dep. 44:19–45:5. Dr. Winer also opined that, "PODS is a valuable brand that has been invested in and protected over many years. The strength of its trademark and good reputation have allowed the company to create a network of franchisees, further enhancing the company's

value." Winer Rpt. at 7. But again, Dr. Winer did no such analysis regarding the value of the brand to franchisees before broadly concluding that such value exists. Winer Dep. 48:16–20; Roe Ex. 28 (Deposition of Dr. Joachimsthaler).

The same flaws exist with respect to Dr. Winer's opinion that "U-Haul's unauthorized use of the PODS trademark and/or variations of the trade name and mark on its website has harmed and continues to harm PEI by diluting the PODS trademark and lessening the value of its brand." Winer Rpt. at 7. Although he opines that U-Haul's actions have somehow harmed PEI and its brand value, he did nothing to test this hypothesis or verify that harm was actually done or that dilution occurred:

> Q.    Can you quantify the extent to which U-Haul's activities in the past few years have lessened the value of the PEI brand?
> A.    I was not asked to do so. . . .
> Q.    Are you aware of whether or not the value of the PEI brand has decreased during the time that U-Haul has made use of the term pods?
> A.    [I]n terms of the value of the brand, no such analysis has been done.
> Q.    Do you know whether or not the value of the PEI PODS brand has gone up or down in the last few years?
> A.    No, I do not.

Winer Dep. 53:8–24. Indeed, Dr. Winer's testimony confirms that his assertions are completely untested and unsupported:

> Q.    Do you have any opinion with respect to lost business?
> A.    I have an opinion that I'm sure that PEI lost business, but I don't know how much.
> Q.    Are you aware of any instances in which consumers have, in fact, purchased other products because of U-Haul's use of pods?
> A.    No.

Winer Dep. 57:16–58:1.

> Q.    Has the value of the PODS trademark already been reduced?
> A.    I believe it has.
> Q.    And are you aware of any calculations as to the reduced value of the PODS trademark?
> A.    I haven't done any calculations, but I'd say that, based on my expert opinion.

Winer Dep. 203:9–15.

Dr. Winer also claims that U-Haul's use of "pod(s)" dilutes or otherwise harms PEI's PODS brand. Winer Rpt. ¶¶ 135–36. Again, Dr. Winer conducted no survey to determine whether his hypotheses were true, although such a survey could easily have been performed. Indeed, U-Haul's expert, Dr. Neal, conducted a survey that showed that there is no association between PEI and its purported mark and that PEI or "PODS" came to mind for fewer than one percent (which is statistically equivalent to zero) of moving and storage customers, and hence dilution is entirely unlikely. Neal Rpt. ¶¶ 41–42.

The Court cannot accept Dr. Winer's naked assertions. *Unleashed Magazine*, 2008 WL 4304883, at *10 ("[B]efore admitting the opinion of an expert, the trial court is required to ensure that the expert's opinion, even if formed based on considerable experience and expertise, is supported by more than the expert's word and that there are 'good grounds based on what is known.'") (citing *Daubert*, 509 U.S. at 590). As was the case in *Novalogic*,

> Dr. Winer's statements regarding [the value of brands] are not supported by evidence in this case, and, most importantly, do not appear to be based on any discernible methodology. Instead, those opinions are based on broad notions and theories of branding and Dr. Winer's testimony on those issues is essentially a compendium of his personal beliefs that are irrelevant to [the] issues in this case.

*Novalogic*, 2013 WL 3234863, 8–9. Dr. Winer's unsupported, personal opinions with respect to the value of PEI's brand and the alleged harm caused by U-Haul should be excluded.

### 6. Dr. Winer's damages calculations are unreliable and should be excluded.

The Winer Report opines that every single person who saw U-Haul's use of "pod" or "pods" on the U-Haul website or in internet search results received a "misimpression" of an association between U-Haul and PEI. Winer Rpt. at 66, ¶ 148. However, Dr. Winer is unable to explain why that is the case, and he does not distinguish even among people who have exactly

the right "impression." In fact, according to Dr. Winer, even a person who 100% believes that "pods" is generic and does not associate U-Box with PEI, would still be receiving a "misimpression" when they visit the U-Box web page or search for "pods" on the internet. Winer Dep. 58:19–24; 167:4–14. On its face, that makes Dr. Winer's methodology unreliable.

And again, Dr. Winer follows no discernible methodology and provides absolutely no empirical support for this opinion. Although this hypothesis was testable, Dr. Winer did not conduct any sort of test or survey to determine whether his novel "misimpressions" theory was true. Winer Dep. 165:1–167:18. His opinion is inadmissible on this basis alone. The Johnson, Poret, and Neal surveys, on the other hand, contain empirical survey data directly refuting any assertion that consumers mistakenly associate U-Haul with PEI when encountering generic uses of "pod(s)." Johnson Rpt. ¶¶ 46–50; Poret Rpt. at 16–17; Neal Rpt. ¶¶ 37–42.

After asserting this baseless opinion, Dr. Winer then, without explanation or justification, relies entirely on the Expert Report of Chris Smith, one of PEI's other experts, to determine "misimpressions" on the U-Haul website and in internet search results between February 2012 and October 2013. Winer Rpt. at 67. But "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

Dr. Winer admittedly is not qualified to perform the damages calculations he purports to conduct or the critiques he offers of the Phillips and Hochman Reports. *See* Winer Dep. 207:7–10 ("I'm just not an expert in this area. . . . I usually just take the numbers as a given, and I don't question the methodology."). Dr. Winer cannot opine on issues for which he has no expertise, and thus simply act as a mouthpiece for another of PEI's experts. *See, e.g., Dura Auto. Sys. Of*

*Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (party's expert disqualified because he relied upon mathematical modeling that was beyond the scope of his expertise; "The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well-credentialed, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."); *Petersen v. Daimler Chrysler Corp.*, 2011 WL 2491026, at *5 (D. Utah June 22, 2011) (excluding portions of expert's report that relied on a report prepared by another person where expert did not have "the requisite familiarity, knowledge, or technical judgment of the methods or reasoning applied by [the other person] to be allowed to present opinions based on the [other] report"; allowing expert to do so would mean "he would effectively be serving as nothing more than a mouthpiece for [the other person]"); 29 Charles Alan Wright, Kenneth W. Graham, Sr., Victor James Gold & Michael H. Graham, *Federal Practice and Procedure* § 6274 (1st ed. 1997).

In light of the above, Dr. Winer's damages opinions and calculations should be excluded, including his opinion (1) that U-Haul avoided costs of at least $12.9 million by using "pod(s)" on its website and (2) that corrective advertising would cost PEI $23.4 million. Winer Rpt. ¶ 15.

## IV.     CONCLUSION

Defendant requests that this Court enter an order setting a *Daubert* hearing or, in the alternative, if the Court determines such a hearing unnecessary, finding that the proffered testimony of Dr. Russell S. Winer is inadmissible, in its entirety, pursuant to Federal Rule of Evidence 702. At the very least, the Court should exclude Dr. Winer's opinions on (1) confusion, (2) genericness, (3) fame, (4) the value of PEI's brand, and (5) damages.

## CERTIFICATE OF LOCAL RULE 3.01(g) COMPLIANCE

U-Haul's counsel consulted with PEI's counsel in an attempt to resolve this matter, but no agreement could be reached.

Dated: April 18, 2014

RESPECTFULLY SUBMITTED:

*/s/ R. Charles Henn Jr.*
William H. Brewster
R. Charles Henn Jr.
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
(404) 815-6500
(404) 541-3240 (facsimile)
Email: bbrewster@kilpatricktownsend.com
Email: chenn@kilpatricktownsend.com

William P. Cassidy
Fla. Bar No. 332630
JOHNSON & CASSIDY, P.A.
324 South Hyde Park Ave., Suite 325
Tampa, FL 33606
(813) 699-4857
(813) 235-0462 (facsimile)
Email: wcassidy@jclaw.com

Leo R. Beus (*pro hac vice*)
BEUS GILBERT PLLC
701 North 44th Street
Phoenix, AZ 85008-6504
(480) 429-3000
(480) 429-3100 (facsimile)
Email: lbeus@beusgilbert.com

*Attorneys for U-Haul International, Inc.*

## Certificate of Service

I hereby certify that the foregoing has been served on counsel of record via the Court's

CM/ECF system.

*/s/ Jennifer Fairbairn Deal*
Jennifer Fairbairn Deal