## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PODS Enterprises, Inc.,

              Plaintiff,

      vs.

U-Haul International, Inc.,

              Defendant.

Case No.  8:12-cv-01479-JDW-MAP

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## TO EXCLUDE THE EXPERT TESTIMONY OF WALTER BRATIC

PODS Enterprises, Inc., ("PODS") hereby opposes U-Haul International, Inc.'s ("U-Haul") Motion To Exclude The Expert Testimony of Walter Bratic. (D.I. 153 "Def.'s Br.").

### I.      PRELIMINARY STATEMENT

U-Haul's Motion to exclude Bratic's testimony is based on two false premises: (i) it is PODS' burden to prove which U-Haul revenues are attributable to its infringement; and (ii) proof of actual confusion is required.  U-Haul is wrong on both fronts.

It is black letter law that U-Haul, as the infringer, has the burden to prove which of its sales are **not** attributable to infringement. *Mishawaka Rubber & Woolen Mfg. Co. v. SS Kresge Co.*, 316 U.S. 203, 207 (1942) (holding that burden is on the infringer to prove which sales are not attributable to infringement and "there may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer."); *see, e.g., FSC Franchise Co., LLC v. Express Corporate Apparel, LLC*, Case No. 8:09-cv-454, 2011 WL 1226002, at *7 (M.D. Fla. Feb. 28, 2011), *adopted* Case No. 8:09-cv-454, 2011 WL 1153840 (M.D. Fla. Feb. 28,

2011); *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987); *Maltina Corp. v. Cawy Bottling Co.*, 613 F. 2d 582, 585 (5th Cir. 1980); J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §30.66 (4th ed.) ("Under the Lanham Act, it is quite clear that, in computing defendant's profits, the defendant has the burden.").

PODS is not obligated to prove actual confusion. *See* Eleventh Circuit Pattern Jury Instructions, 2013 §10.1 at p. 638-39. *See* MCCARTHY §30.63 ("The majority of courts have held that plaintiff need not demonstrate actual confusion or actual damages to obtain an infringer's profit" (citing *Burger King v. Mason*, 855 F. 2d 779, 781 (11th Cir. 1988); *Wesco Mfg.,* 833 F.2d at 1487); *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1322 (N.D. Ga. 2008)("[A]ward of a defendant's profits is not conditioned upon a showing of actual confusion."); *Keg Technologies, Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1373 (N.D. Ga. 2006)(same); *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1292-93 (S.D. Fla. 2010) (awarding profits even though "[plaintiff] produced no evidence of actual consumer confusion, or that it lost any business or suffered actual damages").

Moreover, U-Haul presents these false premises in connection with an erroneous argument that Bratic fails to demonstrate causation. Notwithstanding U-Haul's failure to explain how evidence of causation would affect the methodology for calculating U-Box revenues, which is all that is required of PODS, Bratic did in fact analyze evidence demonstrating that U-Haul's infringement caused a significant increase in U-Haul's U-Box revenues. For example, he considered the admissions by U-Haul that its use of the PODS mark led to a significant increase in web traffic; and the fact that there is a strong correlation between increased U-Box sales and the use of the PODS mark on U-Haul's website after U-Haul had spent years trying, but gaining little traction, in the portable storage market.

U-Haul's only attempt at raising an actual *Daubert* issue is to fault Bratic for using a *Georgia Pacific* methodology to calculate a reasonable royalty as an alternative measure of damages. This is a well-accepted methodology and U-Haul's own damages expert failed to opine that there is an alternative method of calculating a royalty rate in a trademark case that is superior to the *Georgia Pacific* methodology. *See generally* Roe Ex. 22, Philips Rebuttal Report at 44. Moreover, U-Haul fails to show that Bratic performed the *Georgia Pacific* analysis in an unreliable manner.

Finally, U-Haul contends that it is unreliable for Bratic to present the full picture of potential damages to the jury by relying on calculations performed by Dr. Winer, PODS' marketing expert, who will also testify at trial. U-Haul provides no support for excluding Dr. Winer's testimony.

## II.   BRATIC'S DAMAGES OPINIONS

U-Haul states that Bratic opines that PODS is entitled $200 million in damages. Def.'s Br. at 1. This is simply not true, which is clear from Bratic's report. Bratic Rep. ¶¶6, 62-71.[1]

With regard to the measure of defendant's profits, Bratic opined as to the amount of U-Box revenues generated by U-Haul during the period of infringement ($141.2 million) and acknowledged that U-Haul could deduct revenues that U-Haul can prove were not attributable to infringement and other permitted costs and deductions. Bratic Rep. ¶¶53-55; Rebuttal ¶39. Although he recognized it is U-Haul's burden, Bratic estimated the percentage of U-Box revenues that are attributable to U-Haul's infringement based on his evaluation of studies that demonstrate the percentage of customers that were likely exposed to U-Haul's infringement.

---

[1] In support of this Opposition, PODS submits the annexed Omnibus Declaration of Charles E. Cantine ("Cantine Ex.__").The transcript of the January 12, 2014 deposition of Walter Bratic is annexed as Cantine Ex. 47 ("Bratic Tr.__"). The Expert Report of Walter Bratic is annexed to the Declaration of Shivah Roe in Support of U-Haul's Motion as Ex. 30 ("Bratic Rep. at __¶") and the Rebuttal Expert Report of Walter Bratic as Roe Ex. 31 ("Bratic Rebuttal Rep. at __¶").

NY 75057202

Bratic Rep. ¶¶ 62-71 (determining the percentage of U-Box customers that would have seen U-Haul's use of "pods" on the Internet prior to making their purchase); Bratic Rebuttal Ex. 5.1-Updated and 5.2-Updated; Bratic Rep. ¶¶129-132, Exhibits 9-13.1 (comparing U-Box's increase in revenues correlated to the time that U-Haul started using "pods" on its website).  Although he also recognized that it is U-Haul's burden, Bratic analyzed U-Haul's costs and determined that approximately $99.3 million of incremental costs could permissibly be deducted from infringing revenues. Bratic Rep. ¶¶56-61; Bratic Rebuttal ¶¶39-47. Bratic concluded that if U-Haul is able to demonstrate appropriate deductions for incremental costs and that some amount of revenues are attributable to factors other than infringement, then U-Haul's profits from infringement would range from approximately $19.4 million to $28 million. Of course, the burden is on U-Haul to establish such deductions and any uncertainty in U-Haul's proof is resolved in favor of PODS. *See supra Mishawaka*.

Bratic explained that an additional measure of economic damages are the costs U-Haul avoided as a result of its infringement.  Bratic relied on Dr. Winer's calculation of the avoided costs to explain that they are no less than $12.9 million. Bratic Rep. ¶¶72-74 (explaining facts demonstrating saved costs).  Bratic also explained that corrective advertising damages are a separate measure of compensatory damages for losses to PODS and relied on Dr. Winer's calculation that such corrective advertising damages amounts to at least $23.4 million. Corrective advertising is an appropriate measure of PODS' losses in the Eleventh Circuit and calculating it based on the price of Google's Keyword advertising (as Winer did) is an appropriate method. *Aronowitz v. Health-Chem Corp.*, 513 F. 3d 1229, 1241 (11th Cir. 2008) (permitting award of prospective corrective advertising with no limitation on financial inability of plaintiff to pay the

amount); s*ee also.*, *Punch Clock, Inc. v. Smart Software Development*, 553 F. Supp. 2d 1353, 1359 (S.D. Fla. 2008) (same).

Finally, Bratic provided an opinion on damages measured by a reasonable royalty, a method approved by several courts in this Circuit. *See*, *e.g.*, *Babbit Electrs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182-83 (11th Cir., 1994) (awarding profits plus reasonable royalty as measure of plaintiff's loss); *ITT Corp. v. Xylem Group, LLC*, 963 F. Supp. 2d 1309, 1330 (N.D. Ga. 2013) (holding that reasonable royalty is an appropriate measure of damages for trademark infringement); s*ee Sands, Taylor & Wood v. Quaker Oats* Co., 34 F.3d 1340, 1333-34 (7th Cir. 1994), amended 44 F.3d 579 (7th Cir. 1995) (applying reasonable royalty damages measures in a case where traditional measures of measuring infringer's profits were found inappropriate.)

Bratic used the universally accepted *Georgia Pacific* methodology for determining a reasonable royalty. *ITT Corp.*, 963 F. Supp. 2d at 1329-30 ("The methodology for hypothesizing a licensing arrangement and arriving at a reasonable royalty is well-established.") (citing *Lucent Techs, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); *Georgia Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). After an exhaustive analysis, Bratic determined that a reasonable royalty rate would be 5% of U-Haul's infringing revenues, which equates to royalty damages of $3.26 million to $4.7 million (Bratic Rep. ¶¶ 78-147; Bratic Rebuttal, Ex. 6.1-Updated, 6.2-Updated.)

### III.   ARGUMENT

Bratic's testimony is admissible if he is qualified, his methodology is reliable and his testimony assists the trier of fact. *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F. 3d 1333, 1340 (11th Cir. 2003); Fed.R.Evid. 702. Although none of U-Haul's challenges actually concern the reliability of Bratic's opinions, U-Haul purports to challenge Bratic's testimony on

the grounds that his methodology is unreliable.  Def.'s Br. at 1.  To the contrary, as demonstrated above and below, his methodologies are well accepted and performed in a reliable manner.

### A.    BRATIC'S METHODOLOGY FOR DETERMINING U-HAUL'S PROFITS IS RELIABLE

U-Haul first claims that PODS may only recover U-Haul's profits if Bratic presents evidence at to what profits are attributable to U-Haul's infringement. Def.'s Br. at 2.  The United States Supreme Court has held the opposite is true. *See supra* citing *Mishawaka Rubber.*

U-Haul criticizes the apportionment analysis presented by Bratic but fails to acknowledge that it is unnecessary for PODS to present such an analysis, and that any uncertainty in an apportionment analysis must be resolved in favor of PODS. Def.'s Br. at 4-6.   Bratic's apportionment analysis seeks to determine how many U-Box customers would have first seen U-Haul's use of the PODS mark on U-Haul's website or in Google search results before making their purchase. Bratic Rep. ¶¶ 62-71.  Two of the industry studies relied on by Bratic concern consumer's online behavior (one, the percentage of consumers that research products online and then buy in physical store, and two, the percentage that start their research in search engines, such as Google, and then go to specific website).  Bratic also relies on a third study by Digital Research, Inc. ("DRI") concerning consumers who purchase moving and storage services (the relevant consumer segments in this case). (*id.* ¶¶ 48, 65).  The fact that U-Haul customers were included as part of the population surveyed by DRI enhances its relevance.  Moreover, Winer confirmed for Bratic that the surveys he relied on were authoritative.  *See*  Roe Ex. 33, Winer Rep. Cantine Ex. 47, Bratic Tr. 25:22-26:5, 51:15-52:9.

Even assuming Bratic's apportionment analysis is subject to some uncertainty in isolating profits from infringement, such uncertainty is resolved against U-Haul under the Supreme Court's *Mishawaka* decision

U-Haul's criticism of Bratic for not considering evidence of causation (Def.'s Br. at 4-7), while wrong, does not relate to the *Daubert* inquiry because U-Haul does not demonstrate how the alleged omission impacts his methodology, especially in light of the relative burdens of proof that require U-Haul to prove which revenues are not attributable to the infringement. Nevertheless, Bratic considered and analyzed significant data demonstrating U-Haul's infringement caused a significant increase in U-Haul's revenues. *See* Bratic Tr. 37:7-10.

Specifically, Bratic considered that: in 2007, U-Haul placed the highest initial bid to purchase PODS and its registered trademarks and gained access to PODS' confidential business information (Bratic Rep. ¶15, Cantine Ex. 22, Dep. Ex. 151); that shortly after U-Haul withdrew from the bidding process, U-Haul started its U-Box business, but as of October 2008, customer awareness of the U-Box business was virtually non-existent (Bratic Rep. ¶109); that U-Haul recognized PODS awareness in the portable storage business by annotating an industry study with the word "WOW" (*id.* ¶¶103-04); that the U-Box business had little, *if any*, success and in 2010 U-Haul became " very concerned" "about the phones not ringing" (*id.* at ¶¶111-12); that U-Haul admitted its lack of success was due to lack of goodwill in the "U-Box" mark (*id.* at ¶112 ('[U-B]ox' doesn't mean anything to the public")); that U-Haul knew that customers for portable storage would often go to Google and search for "pod" (*id.* at ¶32); that U-Haul determined that achieving presence on the first page of Google search results for phrases including the term "pods" would vastly improve its business (*id.* at ¶¶30-32, 110-111); that in October 2010, U-Haul made changes to its website to include the PODS mark in headlines that would display on Google search results and other places in order to drive customers to the U-Box products (*id.* at ¶¶32-33); that in 2011, U-Haul attempted to purchase Google Adwords including the PODS mark (*id.* at ¶35); that by January 2012, still dissatisfied with the performance of the U-Box

7

business and its presence in Google search results, and notwithstanding legal concerns of infringement raised by U-Haul's management, U-Haul's Chairman, Joe Shoen ordered that the PODS mark be placed in as many places as possible on U-Haul's website (*id.* at ¶¶37-44, 113); that U-Haul internally touted its decision to utilize the PODS mark as that of a "steel-eyed gunfighter"—in contrast to the "scared shopkeep[s]" who were respecting PODS mark (*id.* ¶39.); and that the January 2012 order manifested itself as Web Project Request No. 1322 and resulted in hundreds of thousand references to PODS on U-Haul's website. *Id.* ¶41.

Bratic considered the effects of U-Haul's use of the PODS mark on its website both prior to and after Web Project Request No. 1322.  Bratic considered U-Haul's own admission that U-Haul experienced a "34% change in increased traffic coming in off of the pods generic terms" after the project was implemented. *id.* ¶42.  Bratic analyzed the fact that after years of the U-Box business gaining little traction in the portable storage market, a dramatic increase in U-Box sales occurred immediately after U-Haul began using the PODS mark on U-Haul's website, in particular after the execution of Web Project Request No. 1322.  *Id. at* ¶¶43-45, 117-120; Exhibits 9-10.3 and Exhibit 13. Indeed, after years of relatively minimal growth in revenue, monthly revenues more than doubled the year following U-Haul's first use of the PODS mark (Bratic Ex. 13-13.1), and monthly revenues of U-Box during peak season (June/July) increased from almost $3.5 million to almost $13 million one year after implementation of Web Project Request No. 1322.   Bratic also considered PODS' lost sales survey, which confirmed that PODS was losing an increasing amount of sales to the U-Box product.  Bratic Tr. 8:18-10:25.  The jury has more than sufficient evidence to find that U-Haul's infringement caused its revenues to increase, and that U-Haul's actions were willful and deliberate.

U-Haul also argues that Bratic's opinion is unreliable based on U-Haul's contention that the U-Box business has not been profitable. Def.'s Br. at 4. But this is U-Haul's factual argument that is unrelated to Bratic's methodology for calculating U-Box revenues. Moreover, the argument is contradicted by significant record evidence.  Bratic Rebuttal ¶46 (concluding based on significant analysis that U-Haul generated substantial incremental profits), ¶36 (quoting U-Haul's Chairman stating: "On a marginal basis, I don't think we are losing money."); Cantine Ex. 48, Dep. Ex. 135 (noting that the "dollar impact" from using the term "pods" would  be "significant."); Cantine Ex. 49, UHI 55282-91 (U-Haul's parent company predicts 7.5% growth next year "[f]ueled primarily by expansion of U-Haul's footprint and growth of its U-Box Product" and reports that "U-Box, is a burgeoning…offering that management eventually expects to be a 'several $100 million product line'…")

U-Haul's reliance on *Optimum Technologies, Inc. v. Henkel Consumers Adhesives, Inc.*, Case No. 1:04-CV-1082, 2006 WL 1663357 (N.D. Ga. June 14, 2006) is misplaced. First, the court found the damages were unrelated to the alleged infringement because the expert admitted that his analysis was based on nine claims that had been dismissed, including other claims of trademark infringement. *Id.* at *4.  Thus, the expert failed to measure the damages from the infringing use of the mark on the websites (the remaining claim), which ceased prior to the other dismissed allegations of infringement upon which the damages expert based his opinion. *Id.* Moreover, the Court in *Optimum* does not hold that proof of actual confusion to be a prerequisite to recovery of defendant's profits, and to the extent *Optimum* states a requirement for such proof under an unjust enrichment theory, it improperly relies on the Second Circuit's minority viewpoint.  *Id.* at *8; s*ee also infra* § III.A.i.

U-Haul mischaracterizes *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, Case No. 4:08-CV-03181, 2010 WL 4065465 (S.D. Tex. Oct. 9, 2010) for the proposition that a trademark owner must prove what portion of an infringer's profits are caused by use of a mark. Def.'s Br. at 2, 11. *Interplan* relates to proving damages for copyright infringement, not trademark infringement. *Interplan* supports PODS because the *Interplan* court permitted the copyright owner to rely on the <u>entire</u> gross revenues of two of the defendants who copied the copyrightable architectural plans to design a third defendant's (Thomas) stores. *Id.* at *5. The court did not require the plaintiff to apportion revenues that were derived from the infringement.

Additionally, in determining what portion of the revenues of Thomas's stores, the *Interplan* court found that evidence that Thomas' gross revenues "was caused <u>or in some way affected by the architectural design of the Infringing</u> stores was required." *Id.* at *7 (emphasis added). However, the court was careful to acknowledge that while a copyright owner must present a "revenue stream [that] bears a legally significant relationship to the infringement… to require Plaintiff to establish that the gross revenue were attributable to infringing work 'would be to effectively eliminate the burden-shifting provision of [the Copyright Act] and place the entire burden on the copyright holder." *Id.* at *6. Thus, the court required only a partial causal link ("in some way affected," "significant relationship") because that the particular Defendant was the owner of the store that embodied the architectural plans and not the architects who copied the plans. The Court clearly understood that it should not shift the burden of proof to the plaintiff. Accordingly, the Court did not exclude Bratic's opinion but rather permitted him to supplement his report with facts showing that Thomas' revenues were in some way affected by the design of its stores. *Id. at* *7. In *Interplan*, there was a question whether there was sufficient evidence that revenues of defendant Thomas' stores were affected by the infringing store designs. By contract,

here, there is significant evidence that U-Haul's sales increased as a result of its use of the PODS' mark.  *See, e.g., supra* (citing admission of 34% increase in traffic and strong correlation of U-Haul's use of PODS with increase in U-Box sales).

U-Haul criticizes Bratic for not relying on evidence that purportedly demonstrates there are no revenues attributable to U-Haul's infringement. Def.'s Br. at 5-7 (bullet points on pages 6-7).  However, Bratic is not required to rely on alleged evidence selected by U-Haul, nor is the jury required to accept such evidence. Indeed, with respect to the first bullet point, Dr. Ericksen, PODS' survey expert, will testify that U-Haul's two confusion surveys are flawed and that the jury should reject their conclusions.  Cantine Ex. 8, Ericksen Rep. ¶¶101-102.

Regarding U-Haul's second bullet point, which claims that only 40% of U-Box revenues are made online, Bratic relied on surveys that demonstrate that consumers research a product online before purchasing it in a store. Importantly, U-Haul has no contradictory data indicating how many people first viewed the U-Haul website, or viewed search results in Google showing U-Haul's misuse before calling U-Haul's call center.  In fact, U-Haul's linguist noted several phone calls to U-Haul's call center involving a customer asking for "pods," which suggests that the customer utilized the U-Haul website before contacting U-Haul and saw U-Haul's repeated use of the PODS mark.  Roe Ex. 7, Leonard Rep. ¶107.  Although it is U-Haul's burden to prove which revenues did not result from infringement, U-Haul admitted that it cannot determine how many of its call center and in-store customers had first visited its website before making a purchase.  Cantine Ex. 50, J. Pratt email of Nov. 25, 2011.  Cantine Ex. 51, Sam Shoen Tr. 194:3-6.  Under *Mishawaka*, such uncertainties are resolved in favor of PODS.

The last three bullet points refer to U-Haul's purported compilation of internal data from U-Haul's own web analytics program.  Critically, the data cited by U-Haul in its brief fails to

account for customers who visited U-Haul's website and saw U-Haul's infringing use of the PODS mark and for customers who called U-Haul's call center or visited a local branch after viewing U-Haul's on-line business listings results in Google.  U-Haul also ignores the portions of the cited data compilation showing an 89% increase in the number of monthly visits to the U-Box webpage between November 2011 (prior to Web Project Request No. 1322 (*see supra*) being implemented) and November 2013.  *See* Roe Ex. 29.  Moreover, the data cited by U-Haul was never produced in fact discovery (despite PODS repeated requests for the information) and was first revealed by one of U-Haul's experts in a rebuttal report after U-Haul apparently determined it was advantageous for them to provide the information to try to refute reliable third party data presented by POD's search engine expert.  *See* Cantine Ex. 46, D.I. 111 at 6, 11-12 (citing Cantine Ex. 45, Hochman Tr. 256:3-258:22); Cantine Ex. 52, Smith Tr. 110:15-111:9 (D.I. 187).  U-Haul's expert purported to authenticate the data months later (March 28, 2014) after the initial filing of summary judgment motions.  Roe Ex. 4 at n.49.  Accordingly, PODS never had the opportunity to examine U-Haul's witness on this data or investigate its reliability, and neither Bratic nor PODS' search engine expert had an opportunity to consider the data.  Thus, U-Haul's apparent position is that Bratic should be faulted for failing to consider data that was not available to him because of U-Haul's discovery abuses.

### i.   Proof of Actual Confusion Is Not a Prerequisite to Admissibility

U-Haul asserts that actual confusion must be proved to recover U-Haul's profits <u>under an unjust enrichment theory</u>.  No such requirement exists.  Even assuming, *arguendo*, proof of actual confusion was required, it would be a mere prerequisite to the jury considering Bratic's testimony about profits and does not impact his calculation methodology.   Bratic's calculation of U-Haul's profits would still assist the jury because PODS may be awarded U-Haul's profits if:

12

(1) U-Haul's conduct was willful and deliberate; **or** (2) U-Haul was unjustly enriched; **or** (3) it is necessary to deter future conduct. *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990); 15 U.S.C. § 1117(a); Eleventh Circuit Civil Pattern Jury Instructions, 2013 § 10.1, at p. 638-39.  Moreover, U-Haul's own expert admitted that there is evidence of actual confusion (Cantine Ex. 40, Johnson Tr. 26:20-28:10) and PODS identified several witnesses that will testify about instances of actual confusion. Cantine Ex. 32; Cantine Exs. 33-39.

Nevertheless, contrary to U-Haul's position, the Eleventh Circuit does not require that PODS prove actual consumer confusion in order to recover U-Haul's profits under an unjust enrichment theory.  *See* McCarthy §30.63 ("The majority of courts have held that plaintiff need not demonstrate actual confusion or actual damages to obtain an infringer's profit" (citing *Burger King v. Mason*, 855 F. 2d at 781; *Wesco Mfg.,* 833 F.2d at 1487)); *Trilink*, 583 F. Supp. 2d at 1322 ("[A]ward of a defendant's profits is not conditioned upon a showing of actual confusion."); *Keg Technologies*, 436 F. Supp. 2d at 1373 (same); *Tiramisu Int'l,* 741 F. Supp. 2d at 1292-93 (awarding profits even though "[plaintiff] produced no evidence of actual consumer confusion, or that it lost any business or suffered actual damages").

U-Haul cites no Eleventh Circuit decision establishing that proof of actual confusion is required to recover profits under an unjust enrichment theory. U-Haul relies on two district court decisions outside of the Middle District of Florida, which rely on the Second Circuit's minority view on this issue. D.I. 151 at 23 (citing *Optimum Techs., Inc. v. Home Depot USA, Inc.*, 78 U.S.P.Q. 2d 1801, 2005 WL 3307508, at *3 (N.D. Ga. 2005); *Drew Estate Holding Co. v. Fantasia Distribution, Inc.*, Case No. 11-219000, 2014 WL 1319328, at *7 (S.D. Fla. Apr. 1, 2014)]; McCarthy §30.63 n.6 (identifying Second Circuit has minority view).

## C.     BRATIC'S ROYALTY ANALYSIS IS RELIABLE

### i.     Bratic's Royalty Base is Appropriate

U-Haul claims that Bratic violates the Entire Market Value Rule ("EMVR") by including the gross U-Box revenues in his royalty base.  Def.'s Br. at 11-12.  But Bratic provided reasonable royalty calculations based on multiple royalty base scenarios, including a range of royalty bases including revenues that Bratic estimated were attributable to U-Haul's infringement.  Bratic Rep. ¶147 ($64.1 million to $92.7 million based on different apportionment factors analyzed in Bratic's report).  Moreover, the EMVR is a patent law doctrine reflecting the burden on the patentee to apportion profits due to the invention. In effect, the EMVR requires that royalties be based on the "smallest salable patent-practicing unit." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).  Unlike patent law, where the patent practicing unit may be an economically separable unit from the entire product, trademark law represents the goodwill of the markholder and there is an inherent difficulty and recognized uncertainty of separating out the benefit of the trademark from the other factors contributing to a sale of a product, which explains why, unlike patent law, trademark law places the burden on the wrongdoer to perform that task.  *See supra Mishawaka*.

### ii.     Bratic's Reliance on License Agreements Is Reliable

U-Haul next asserts that Bratic's reliance on a *Georgia Pacific* analysis is improper and that his use of comparable license agreements is unreliable.  Def.'s Br. at 12-14 & n .6.  The *Georgia Pacific* analysis is well accepted and applied in trademark cases. *See supra* § II.

Further, reliance on comparable license agreements is a well-accepted and reliable methodology in a *Georgia Pacific* analysis.  *Apple Inc. v. Motorola, Inc.*, --F. 3d--, Nos. 2012-1548, 2012-1549, 2014 WL 1646435, at *29 (Fed. Cir. Apr. 25, 2014).  For admissibility, all that

is required is a factual basis that links the agreement to the expert's opinion.  *Uniloc US, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (finding that there must be a factual basis to associate prior licenses with hypothetical negotiation at issue); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (rejecting *Daubert* challenge to testimony of a damages expert who relies on comparable licenses); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010)598 F.3d at 854 (holding expert's reliance on benchmark that was a higher end product with more features than the accused product was reliable).  Whether the analysis is perfect is not an admissibility issue as "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty'."  *Lucent*, 580 F.3d at 1325 (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)).

U-Haul asserts that Bratic's reliance on the SUSA License Agreement is not reliable because it is not comparable. Contrary to U-Haul's position, Bratic provided a sufficient factual basis for finding that the SUSA License Agreement is comparable and, as explained above, the degree of comparability is a question of weight, not admissibility.

Bratic conducted research regarding royalty rates for potentially comparable trademarks in the public domain.  Bratic Rep. at ¶136.  He identified the SUSA License Agreement as a comparable agreement. The license is comparable because it is for the trade name "Storage USA" (Def.'s Br. at 13-14), a competitor to PODS and U-Haul in the portable storage market. Bratic also determined that utilizing a license for "Storage USA" as a benchmark was conservative as it undervalues the value of a license for PODS because the public awareness of PODS dwarfed that of Storage USA.  Bratic Rep. ¶¶ 137-38.

The SUSA Agreement was utilized in Houlihan Lokey's ("Houlihan") 2007 valuation of PODS' trade name.  The Houlihan valuation also relied on four other license agreements, but

15

none were in the same industry as PODS.  Bratic Rep. ¶141. (identifying four licenses in the home security, transportation, car rental industries).  Thus, Bratic sought further support on the issue of comparability by interviewing Dr. Winer, PODS' marketing expert.  Contrary to U-Haul's assertion (Def.'s Br. at 12), the interview was not undocumented as Bratic detailed in his report precisely what he discussed with Dr. Winer.  Bratic Rep. ¶142.  Dr. Winer opined that a license for a trademark in the same industry as PODS would be more instructive on the royalty rate for a license of the PODS marks than license agreements in the fields of home security, transportation and/or car rental industry. *Id.* Thus, contrary to U-Haul's argument (Def.'s Br. at 12), Bratic did not ignore the Houlihan valuation but rather studied it critically to determine what data relied on by Houlihan could be informative for the hypothetical negotiation.  Bratic Rep. ¶147. Unlike *Fenner Investments, Ltd. v. Hewlett Packard Co.*, Case No. 6:08-CV-273, 2010 WL 3911372 (E.D. Tex. Apr. 16, 2010), where there was nothing in the record about the substance of the interview because the relied upon technical expert was not deposed or questioned on why he thought the technology involved in certain agreements are comparable, here the substance of the interview of Dr. Winer was reported in Bratic's report over a month prior to Dr. Winer's deposition at which time U-Haul had the opportunity to fully examine Dr. Winer's opinions on this issue.

U-Haul argues that reliance on the SUSA Agreement is unreliable because it is between related parties.  Def.'s Br. at 14.  Bratic considered this fact and explained that this made it a conservative benchmark, particularly in the context of a hypothetical negotiation between competitors like PODS and U-Haul who would negotiate a higher royalty rate than related parties.  Bratic Rep. ¶¶ 128, 140; *see also id.* at ¶90 (*Georgia Pacific* Factor 5.)

U-Haul also mischaracterizes Bratic's consideration of the 8% PODS franchisee fee. Def.'s Br. at 13.  In his report, Bratic acknowledged that a franchise fee includes more than a bare license to the PODS mark, and specifically stated that it was a data point that the parties would have considered, concluding that the "royalty for rights to only the PODS Marks would be something less than 8%."  Bratic Rep. ¶86.

### iii.    Bratic's Use of A Reasonable Royalty Analysis Was Not Based On Unreasonable Inferences

U-Haul's final argument as to why Bratic's reasonable royalty opinion is unreliable is perplexing. Essentially, U-Haul argues that: (i) U-Haul would never have agreed to a license of the PODS mark because it is generic and (ii) PODS would never have agreed to license U-Haul for U-Haul's generic use of the PODS mark.  Def.'s Br. at 14.  U-Haul characterizes these as unreasonable inferences about the parties' willingness to enter into any hypothetical negotiation.

U-Haul's argument is contrary to applicable law as the hypothetical negotiation necessarily assumes that the parties would enter into a license for the PODS mark, which is assumed to be valid and to have been infringed.  As the Federal Circuit explains:

> The hypothetical negotiation is often referred to as a "willing licensor/willing licensee" negotiation. However, this is an inaccurate, and even absurd, characterization when, as here, the patentee does not wish to grant a license. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081, 219 USPQ 679, 684 (Fed.Cir.1983) ( The willing licensee/licensor concept is "employed by the court as a means of arriving at reasonable compensation and its validity does not depend on the actual willingness of the parties to the lawsuit to engage in such negotiations[; t]here is, of course, no actual willingness on either side."); *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 900, 229 USPQ 525, 528 (Fed.Cir.) ("The willing licensee/licensor approach must be flexibly applied as a `device in the aid of justice.'")

*Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F. 3d 1538, 1576 n.13 (Fed. Cir. 1995) (en banc).

17

In fact, U-Haul's argument highlights why a 5% royalty rate understates the harm to PODS. Essentially, U-Haul argues that no one would ever license a party to use a mark generically because such conduct is so egregious. But in the context of a hypothetical negotiation, a hesitance to license would inform a higher royalty rate. Bratic Rep. ¶90.

### D. BRATIC'S TESTIMONY CONCERNING AVOIDED COSTS AND CORRECTIVE ADVERTISING WILL ASSIST THE JURY

U-Haul next seeks to prevent Bratic from testifying as to the corrective advertising and avoided costs damages because they are calculated by Dr. Winer. U-Haul's position is without merit. Fed. R. Evid 702, Committee Notes (2000) ("The term "data" is intended to encompass the reliable opinions of other experts.") Unlike *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.* where the other expert's opinion at issue was from a report in another litigation and not subject to cross examination, U-Haul deposed Dr. Winer and may cross examine him at trial about his calculations. 432 F. Supp. 2d 1319, 1356-57 (S.D. Fla. 2006) (holding that counsel during its closing argument impermissibly focused jury's attention on substance of other's expert report after Court held the report may be used in connection with Bratic's testimony for a limited purpose).

U-Haul's argument boils down to a complaint that it is unreliable for Bratic to present the full picture of potential damages to the jury by including categories of damages calculated by Dr. Winer, who will also testify in this case. There is no support for excluding Bratic from presenting this information, and excluding such testimony would likely cause jury confusion. The jury would likely expect that PODS' damages expert, Bratic, will summarize and discuss the various damages that PODS seeks. Moreover, under the Lanham Act, different measures of damages are cumulative. 15 U.S.C. § 1117; *Inmuno Vital, Inc. v. Golden Sun, Inc.*, 49 F. Supp. 2d 1344, 1362 (S.D. Fla. 1997) ("This recovery is cumulative, that is, the court may award the

18

registrant both its damages and the infringer's profits".) *See Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182 (11th Cir.1994). The statute vests considerable discretion in the district court, and 'no hard and fast rules dictate the form or quantum of relief'. *Burger King Corp. v. Mason*, 710 F.2d 1480, 1495 & n.11 (11th Cir. 1983).   Bratic is a well-qualified damages expert and is qualified to discuss the economic features of the various measure of damages to address what measure of damages compensate for particular economic harm. Bratic Rep. Ex. 1.   Not allowing Bratic to mention the other measures of damages recoverable by PODS might lead to confusion as to what cumulative damages are sought by PODS.

Finally, U-Haul's claim that corrective advertising damages requires evidence of actual confusion plus either (a) past corrective advertising or (b) financial inability to pay for advertising is incorrect. U-Haul cites no Eleventh Circuit case in support of this proposition because none exists. U-Haul ignores *Aronowitz*, 513 F. 3d at 1241 and other district cases that permit awards of prospective corrective advertising with no such limitation on financial inability. *See, e.g.*, *Punch Clock*, 553 F. Supp. 2d at 1359 (finding cost of seven years for corrective advertising through Google AdWords is the appropriate measure of corrective advertising damages).   In fact, other courts have explicitly rejected the notion that financial inability to pay for corrective advertising is a prerequisite to recovery of corrective advertising damages. MCCARTHY §30.82 (citing *Adray v. Adry-Mart, Inc.*, 68 F.3d 362 (9th Cir. 1995), amended, 76 F.3d 984 (9th Cir. 1996) ("We see no reason to so limit the availability of essentially compensatory damages.")

The out-of-circuit authority cited by U-Haul on the issue of corrective advertising is misplaced because the cases rely on the BIGFOOT model of damages from *Big O Tire Dealers, Inc.* v. *The Goodyear Tire and Rubber Co.*, 561 F.2d 1365, 1374 (10th Cir. 1977).   The

BIGFOOT theory is not followed by the Eleventh Circuit and sister courts explicitly decline to follow its model. *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, Case No. 09-61490, 2011 WL 2295269, at *13 n.4 (S.D. Fla June 8, 2011).   U-Haul's claim that a court excluded Bratic's opinion on corrective advertising in *Data Race, Inc. v. Lucent Tech., Inc.,* 73 F. Supp. 2d. 698, 725-26 (W.D. Tex. 1999) is incorrect. Def.'s Br. at 16.   Bratic did not opine on corrective advertising in *Data Race*.  *Id.* at 726.  The *Data Race* court found that the submission of a declaration from Bratic concerning damages for the first time after the hearing on summary judgment was procedurally improper, and that Bratic's opinions did not defeat summary judgment because he opined that he could not determine whether sales were lost and opined only on what an appropriate royalty rate would be if infringing sales occurred in the future.  *Id.* at 727.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, U-Haul's motion should be denied in all respects.

Date:  May 12, 2014                                Respectfully submitted,

Jonathan B. Sbar, FBN 131016
Raul Valles, Jr., FBN 148105

ROCKE MCLEAN & SBAR, P.A.
2309 S. MacDill Avenue
Tampa, FL 33629
Phone: 813-769-5600
Fax: 813-769-5601
Email: jsbar@rmslegal.com
          rvalles@rmslegal.com

*/s/ Charles E. Cantine*
Joseph Diamante
Charles E. Cantine
Jason M. Sobel
Vivian Luo
Admitted *Pro Hac Vice*

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York
Phone: 212-806-5400
Fax: 212-806-6006
Email: jdiamante@stroock.com
          ccantine@stroock.com
          jsobel@stroock.com
          vluo@stroock.com

*ATTORNEYS FOR PLAINTIFF, PODS ENTERPRISES, INC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

electronic mail to the following:

.

R. Charles Henn, Jr.
William H. Brewster
Jessica A. Pratt
Dennis L. Wilson
KILPATRICK TOWNSEND & STOCKTON, LLP
Suite 2800
1100 Peachtree St.
Atlanta, GA 30309-4530
Tel:  404-815-6500
Email: chenn@kilpatricktownsend.com
         bbrewster@kilpatricktownsend.com
         japratt@kilpatricktownsend.com

William P. Cassidy, Jr.
JOHNSON & CASSIDY, P.A.
324 S. Hyde Park Avenue, Suite 325
Tampa, Florida 33606
Tel. 813-699-4857
wcassidy@jclaw.com

Leo R. Beus
BEUS GILBERT PLLC
701 North 44th Street
Phoenix, AZ 85008
Tel: 480.429.3001
Email:  lbeus@beusgilbert.com

*Attorneys for Defendant U-Haul International, Inc.*

Date: May 12, 2014                   *s/ Ellen G. Brier*
                                     Ellen G. Brier

NY 75057202