**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**PODS ENTERPRISES, INC.,**

      **Plaintiff,**

**vs.**                                                            **Case No. 8:12-cv-01479-T-27MAP**

**U-HAUL INTERNATIONAL, INC.,**

      **Defendant.**

_____/

## ORDER

**BEFORE THE COURT** is U-Haul's Renewed Motion for Directed Verdict, For Judgment

as a Matter of Law, Or in the Alternative, Motion for a New Trial (Dkt. 348), which PODS opposes

(Dkt. 352). U-Haul was permitted to file a reply (Dkt. 353). Upon consideration, the motion (Dkt.

348) is **DENIED**.

**I.     BACKGROUND**

      PODS Enterprises, Inc. brought this action against U-Haul, contending that U-Haul's use of

the words 'pod' and 'pods' to market its U-Box product, which competes in the moving and service

industry with some of PODS' products, violated federal and state law. (*See id.*). PODS owns federal

trademarks for "PODS" and for "PODS PORTABLE ON DEMAND STORAGE" for containers

used in the storage and transportation of goods and in moving and storage services. *See* PX 1, 2

("PODS" marks); PX 9, 10 ("PODS PORTABLE ON DEMAND STORAGE" marks). PODS stated

eight claims against U-Haul: federal and state trademark infringement, federal and state unfair

competition, federal and state trademark dilution, state deceptive and unfair practices, and unjust

1

enrichment. (*Id.*). U-Haul asserted several affirmative defenses. (Dkt. 6). One of those affirmative

defenses – that Plaintiff's 'PODS' marks were generic *ab initio* and ineligible for trademark

protection – is the subject of U-Haul's motion.



Image of PODS-branded container

After a two-week trial and three days of deliberations, the jury found for PODS and against

U-Haul on all counts, counterclaims, and affirmative defenses, and returned a verdict of $60.7

million in favor of PODS. (Dkt 337). U-Haul made several Rule 50 motions at trial. (Dkts. 321, 323,

329). All were denied except for U-Haul's motion for directed verdict on genericness, on which

ruling was deferred. (Dkt. 362 at 217 (Sept. 19 Trial Tr.)). The parties were ordered to brief the

motion for a directed verdict on genericness, which is now before the Court.

## II.   STANDARD

In deciding a Rule 50 motion, the court's "proper analysis is squarely and narrowly focused

on the sufficiency of evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007).

The standard is whether the evidence is "legally sufficient to find for the party on that issue,"

regardless of the timing of the motion. *Id.*; Fed. R. Civ. P. 50(a)(1). The court "should review all of the evidence in the record," but "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-151 (2000). The court should disregard evidence that the jury need not believe. *Id.*

A Rule 50 motion should be granted "only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). When a Rule 50 motion is considered after a jury verdict, the court's review is limited to whether there is sufficient evidence to support the verdict. *Chaney*, 483 F.3d at 1227. The court should "give credence to . . . evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010) (quoting *Reeves*, 530 U.S. at 151). A directed verdict is "an extraordinary remedy" for a party that unsuccessfully bore the burden of proof at trial, as U-Haul did on the affirmative defense of genericness. *Link v. Mercedes-Benz of North America, Inc.*, 788 F.2d 918, 920 (3d Cir. 1986).[1]

## III.   DISCUSSION

### A.   Legal Standard for Genericness

#### 1.   *Test for Genericness*

The Lanham Act has codified the test for genericness: the primary significance of the mark

---

[1] In the alternative, U-Haul argues it is entitled to a new trial, citing Fed. R. Civ. P. 59. This motion is discussed *infra*.

to the relevant public. 15 U.S.C. § 1064(3); *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1320 (11th Cir. 2012). The term is generic if the primary significance of the mark is "the term by which the product or service itself is commonly known," a depiction of the product as a whole, rather than a particular feature of the product, or the name of a class of products rather than an individual brand. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007) (citations omitted). The First Circuit has explained: "Rather than answering the question "where do you come from?", a generic term merely explains "what are you?"" *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 14 (1st Cir. 2008) (citation omitted). Genericness is based on the use of a word in its relevant context, not the word itself. ""[I]vory' is generic of elephant tusks but arbitrary as applied to soap." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183, 1186 (5th Cir. 1980).[2]

The relevant public are actual or potential purchasers of the goods in question. *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 544 (10th Cir. 2000); *Burger King Corp. v. Pilgrim's Pride Corp.*, 705 F. Supp. 1522, 1525 (S.D. Fla. 1988) (*aff'd sub nom. Burger King v. Pilgrim's Pride*, 894 F.2d 412 (11th Cir. 1990)) (denying directed verdict on genericness defense because "although there was evidence that the term 'tender' might be generic within the chicken industry, it was not generic among . . . retail consumers.").

As the Supreme Court has stated, "when the relevant question is how an ordinary person or community would make an assessment, the jury is generally the decisionmaker that ought to provide the fact-intensive answer." *Hana Fin., Inc. v. Hana Bank*, 135 S.Ct. 907, 911 (2015). Therefore,

---

[2] Opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

whether a given term is generic is a question of fact. *In re Watts*, 8 Fed. App'x 967, 968 (Fed. Cir. 2001) (citing *In re Nett Designs Inc.*, 236 F.3d 1339, 1341 (Fed. Cir. 2001)); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 300 (7th Cir. 1998).

### 2. *Genericness* Ab Initio *and Incontestable Status*

Generic terms "cannot be appropriated from the public domain." *Welding Servs.*, 509 F.3d at 1358; *Soweco*, 617 F.2d at 1183 ("A generic term can never become a trademark.") (citing *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977)) (other citations omitted). *See Nassau v. Unimotorcyclists Soc'y of Am., Inc.*, 59 F. Supp. 2d 1233, 1238 (M.D. Fla. 1999) ("[T]rademark law prevents a person from removing a word from the general language and appropriating it for his own trademark.") This motion concerns U-Haul's affirmative defense that the terms 'pod' and 'pods' were generic *ab initio* before Plaintiff registered its marks with the PTO.[3] A mark is generic *ab initio* if it is generic at the time the company adopted it as a trademark. *See Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006); *Miller Brewing*, 561 F. 2d at 77 ("because 'light' is a generic or common descriptive word when applied to beer . . . that word . . . may [not] be appropriated as a trademark for beer.") Terms can also become generic as a result of genericide, which means that a word that began as a coined term became generic through common usage. *See Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 255 (4th Cir. 2001); *Burger King,* 705 F. Supp. at 1524-25.

PODS claims that because its trademarks have reached incontestable status, they are only subject to cancellation on the grounds of genericide and not as generic *ab initio*. Trademarks achieve

---

[3] In considering whether the terms 'pod' and 'pods' were generic *ab initio*, it is not necessary to analyze their usage after PODS registered its first trademark in 1998. *See Hunt Masters*, 240 F.3d at 255; *Schwan's IP*, 460 F.3d at 975-76.

incontestable status after they have been used in commerce for five years after they were issued, as is the case for two of PODS' trademarks. 15 U.S.C. § 1065. *See* PX-1; PX-2. While the Lanham Act permits incontestable trademarks to be challenged on the grounds of genericness, 15 U.S.C. § 1064(3), PODS contends this challenge is limited to genericness as a result of genericide, and does not apply to a generic *ab initio* claim. U-Haul argues that courts have found marks that have reached incontestable status to be generic *ab initio*. *See Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 542-43 (4th Cir. 2004); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936-39 (7th Cir. 1986). *See also Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812 (2d Cir. 1999) ("Our case . . . concerns a mark that starts out generic and is sought to be given trademark significance by a manufacturer. That is what *Abercrombie* [*& Fitch Co. v. Hunting World*, 537 F.2d 4 (2d Cir. 1976) (Friendly, J.)] and other cases forbid.") In any event, this dispute need not be resolved because even assuming that an incontestable trademark can be canceled on the ground it was generic when adopted, U-Haul has failed to show that the evidence is legally insufficient for a jury to find for PODS on the issue, as explained below.

### B.   Evidence Relevant to Genericness

Courts consider a variety of evidence relevant to the issue of genericness, including dictionary listings, usage in the popular and specialized media, in the military, in patents, and in industry, and usage by competitors, by the holder of the trademark, and by the government. Consumer testimony and surveys also provide relevant evidence. Particularly relevant evidence to claims of genericness *ab initio* includes dictionary definitions and  usage of the term by the media, industry, competitors, and holder of the mark. *See Boston Duck Tours, LP*, 531 F.3d at 18-19 (finding mark to be generic *ab initio* based on industry, media, and plaintiff's use); *Ale House Mgmt.,*

6

*Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 141 (4th Cir. 2001) (finding mark generic *ab initio*

based on dictionary listings and industry and media use); *Harley-Davidson*, 164 F.3d at 808-12

(finding mark generic *ab initio* based on newspaper and media use); *Miller Brewing*, 561 F.2d at

80-81 (finding mark generic *ab initio* based on dictionary, reference works, and other industry use);

*Eastern Air Lines v. N.Y. Air Lines, Inc.*, 559 F. Supp. 1270, 1276 (S.D.N.Y. 1983) (finding mark

generic *ab initio* based on dictionary and media use, and lexicographer testimony).

### 1. *U-Haul's Evidence of Genericness*

U-Haul introduced a significant amount of evidence, largely through the testimony of its

expert linguist, Dr. Robert Leonard, in support of its claim that the word "pod" was generic before

Plaintiff registered its marks with the PTO. This evidence can be divided into six overarching

categories: (1) dictionary definitions, (2) media usage, (3) military usage, (4) usage in patents, (5)

industry usage, and (6) usage by Plaintiff.

### a. Testimony of Dr. Leonard

Dr. Leonard boasts strong qualifications as a linguist. A tenured professor of linguistics at

Hofstra who was educated at Columbia University, he has testified as an expert witness in many

cases, and holds a number of significant professional memberships, including with the Linguistic

Society of America, the International Association of Forensic Linguists, and the Editorial Board of

Oxford University Press's series on "Language and the Law." *See* DX 579. PODS did not challenge

Dr. Leonard's qualifications as an expert witness. Dr. Leonard told the jury he "sought to establish

patterns in a broad cross-section of documents" from before 1998, and after conducting his analysis,

he concluded that the words 'pod' and 'pods' were generic for "containers for the storage and

transportation of goods" by 1998. (Dkt. 361 at 28).

Nevertheless, the jury was under no obligation to accept Dr. Leonard's methodology or conclusions. As he admitted under cross-examination, all the materials he analyzed, with the exception of a handful of dictionaries, were provided to him by U-Haul's counsel. (*See* Dkt. 361 at 55-57; Dkt. 236). While these documents speak for themselves and should have been considered by the jury, the jury did not have to believe they were a representative "cross-section" of documents nor that their presence settled the question of genericness, especially because most of the documents were provided to Dr. Leonard by counsel, not through his independent research. "Even uncontradicted expert opinion testimony is not conclusive, and the jury has every right not to accept it." *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1470 (11th Cir. 1989) (citing *Remington Arms Co., Inc. v. Wilkins*, 387 F.2d 48, 54 (5th Cir. 1967)).

### b. Dictionary Definitions

The *Harley-Davidson* court, which heavily relied on dictionary definitions in holding the term 'hog' was generic *ab initio* for a large motorcycle, noted "dictionary definitions of a word to denote a category of products are significant evidence of genericness because they usually reflect the public's perception of a word's meaning and its contemporary usage." 164 F.3d at 810. If a term appears "in a standard dictionary in lower case, this would be powerful evidence that the term was generic, because nouns and other nominatives listed in dictionaries, save for the occasional proper name, denote kinds rather than specific entities ("dog," not "Fido")." *Door Systems, Inc. v. Pro–Line Door Systems, Inc.*, 83 F.3d 169, 171 (7th Cir. 1996). Courts have held that roughly uniform definitions across dictionaries can establish genericness in a broad sense. *See Freebies*, 364 F.3d at 544; *Ale House Mgmt.*, 205 F.3d at 141.

At trial, U-Haul introduced excerpts from eight dictionaries dating from 1959 to 1987

defining the word 'pod,' all before the federal registration of the trademarks in question. Six of these dictionaries defined 'pod' arguably in reference to the aerospace industry. *See* DX 582 (definition from 1959 NASA Aeronautical Dictionary); DX 583 (general dictionary defining 'pod' as "A streamlined compartment under the wings or fuselage of an airplane used as a container (as for fuel)"; DX 584 (military dictionary containing two uses of 'pod' in reference to airplanes); DX 585 (general dictionary defining 'pod' in aeronautics context); DX 586 (general dictionary defining 'pod' in spacecraft context); DX 587 (general dictionary defining 'pod' in aerospace context). The jury was entitled to give all of these usages – uncontroverted by PODS – weight in the genericness analysis. But it was permissible for the jury to give these dictionary definitions little weight if the jury believed these definitions did not have meaning to the "relevant public" of "actual or potential purchasers of the particular goods and services in the marketplace." *Creative Gifts*, 235 F.3d at 544.

Two of the general purpose dictionaries defined 'pod' more broadly. *See* DX 588 (1983 Merriam-Webster Ninth New Collegiate Dictionary defining 'pod' as "a streamlined compartment under the wings or fuselage of an aircraft used as a container (as for fuel); *broadly*: a protective container or housing (a submarine with its reactor in an external [pod])"); DX 589 (1987 Random House Dictionary of the American Language, Unabridged Second Edition, "4. a streamlined enclosure, housing, or detachable container of some kind: *an engine pod under the wing of an aircraft*. 5. a protective compartment, as for an automobile's instrument gauges."). PODS contends that these definitions are focused on aerospace. This argument misreads the definitions, which demonstrate that these meanings of 'pod' originated in the aerospace context, but came to take on additional, broader meanings over time. (*See* Dkt. 361 at 36 (testimony of Dr. Leonard)). However, the parties disputed the applicability of these definitions to the products made by PODS and U-Haul,

9

and the jury could have reasonably sided with PODS's view that its containers were not 'streamlined' or 'detachable.' (Dkt. 345 at 52-53, 248-250). In sum, although the dictionary definitions provided support for U-Haul's theory, the jury was under no obligation to give them significant weight in determining whether the trademarks at issue were generic.

### c. Use in Media and Books

U-Haul introduced several examples of allegedly generic use of the word 'pod' in popular magazines and books before the relevant trademark registration. Many courts have cited evidence of media use in finding trademarks generic *ab initio*. *See Schwan's IP, LLC*, 460 F.3d at 975–76; *Harley-Davidson*, 164 F.3d at 811; *Eastern Air Lines*, 559 F. Supp. at 1270.

One of the articles, from the January 1969 issue of *Popular Mechanics*, describes a newly-patented device, which looked remarkably like the containers sold by PODS three decades later, that facilitated:

> "SWITCHING CARGO from a trailer truck to an airplane . . . . The truck's body is actually a detachable cargo pod shaped to form the lower half of the plane's fuselage. The plane is jacked up on telescoping landing gear, the truck backs under it, and the pod is bolted on . . . . The pods could also be transported via railroad on flatcars and in container ships." DX 601.04.



Excerpt from DX 601.04

U-Haul also offered two usages of 'pod' and 'pods' that could be interpreted to refer to moving containers. In DX 597, "A Real 'Nation's Attic,'" from the November 1997 issue of *Smithsonian*, the author referred to 'storage pods' and 'pods' in several locations. DX 596, a 1992 science fiction novel by Thomas A. Easton, *Woodsman*, included the text: "[A truck] hauled a heavy cargo pod along the road."; and "There were few signs, and fewer logo-marked cargo pods awaiting loading and unloading." These three uses of 'pod' in the generic sense for containers support U-Haul's claim of genericness. However, three media uses over the course of several decades, of which two were somewhat ambiguous, are not by themselves sufficient evidence to reverse the jury's verdict. *See Frito-Lay, Inc. v. Bachman Co.*, 704 F. Supp. 432, 440 (S.D.N.Y. 1989) (declining to grant summary judgment on genericness where the defendant "offered no proof of widespread, as distinguished from fairly scattered, consumer use of 'ruffles' as a generic term for food in general or for potato chips in particular").

U-Haul introduced several items of evidence suggesting that storage containers placed on a vehicle's rooftop were generically called "pods" before 1998. *See* DX 594.03 (March 1984 *Mechanix Illustrated* article on "rooftop storage pod" available for recreational vehicless); DX 600.03 (November 1979 *Popular Mechanics* classified ad referring to "CARTOP CAMPER/STORAGE POD); DX 595 (*Camping with Kids*, instructional guidebook by Don Wright (1992), stating "Options for increasing the space on top of your vehicle include a car top carrier and storage pod or a rented utility trailer."); DX 597 (1997 book by Kim and Sunny Baker, *The RVer's Bible: Everything You Need to Know About Choosing, Using, and Enjoying Your RV*, includes section on "Storage Pods," including: "Seen atop many rigs are cream-colored storage pods. . . . Pods are an excellent storage option. . . . On most rigs the pod is mounted above or slightly forward of the rear axle(s). One large pod on the roof of a big motorhome can hold a lot of gear . . . ."). However, the jury did not have to accept that the use of the term 'pod' to refer to a roof-mounted container on RVs described the same kind of product as the PODS-branded containers.[4]

### d. Use in the Military

Through the testimony of Dr. Leonard and Lt. Gen. Robert Dail (USA, Ret.), U-Haul attempted to show that the military used the terms 'pod' and 'pods' generically before 1998. Courts have considered prior military usage in deeming terms to be generic. *See Boston Duck Tours*, 531 F.3d at 8, 16; *W.R. Grace*, 581 F. Supp. at 153-54.

Gen. Dail, who spent most of his 35 years in the military in transportation and logistics, testified that the word 'pod' was used for detachable containers used for the storage and

---

[4] The same is true for DX 599.10, a February 1961 *Popular Mechanics* article, which in the aerospace context used the caption of "baggage pod" without explanation.

transportation of goods ever since he entered the Army in 1975. (Dkt. 360 at 214-215).[5] In support

of Gen. Dail's contentions, U-Haul offered evidence of a military film which used the terms 'pod'

and 'mini-pod' to describe movable containers and a copy of an pilot's manual for the Army CH-

54B helicopter which used the word 'pod' throughout, including a picture of a "Universal Military

Pod." DX 578, DX 593. *See also* DX 577 (images of military containers Gen. Dail testified were

called 'pods.')



Excerpt from

DX 593

The parties dispute the significance of this evidence and testimony. U-Haul argues that the

military usage is strong evidence of the primary significance of the term 'pod' before 1998. Indeed,

both *Boston Duck Tours* and *W.R. Grace* rely on military usage in finding marks generic. 531 F.3d

at 8; 581 F. Supp. at 153-54. PODS responds that the military's use of the term does not establish

the primary significance of the term to the relevant public – here, consumers of moving and storage

---

[5] This testimony was contradicted by testimony from PODS witnesses who had served in the military, who claimed 'pod' was not generally used as a term for storage containers. (*See* Dkt. 356 at 95, 99). The jury was entitled to find these witnesses credible.

services. While PODS is incorrect to call military use irrelevant, the jury was entitled to make its own determination of how much weight to place on military use. Much like the dictionary and media usage, the use of the term 'pod' by the military provides some support for U-Haul's position, but does not mandate a conclusion different from that made by the jury. Indeed, U-Haul's testimony on military usage was contradicted by testimony from PODS witnesses who had served in the military, who claimed 'pod' was not generally used as a term for storage containers. (*See* Dkt. 356 at 95, 99). The jury was entitled to find PODS' witnesses credible.

### e.  Patents

U-Haul introduced three patents that used the term 'pod' for storage containers in the 1940s and 1950s. *See* DX 590, DX 591.05, DX 592. Courts have used patent applications as evidence in finding marks generic. *See Liquid Controls*, 802 F.2d at 936-39. However, all three of these patents were in the aerospace context, and as with the dictionary definitions in that field, the jury could have reasonably given little weight to them if it determined that their use in that context had little effect on the relevant consuming public of actual and potential customers of PODS' products.

### f.  Industry Usage

Three industry witnesses testified that the word 'pod' was used generically in the moving and storage industry before 1998. (*See* Dkt. 359 at 182, 186-187, 193-94, 197 (testimony of Tom Miller of Public Storage on usage in the 1970s); Dkt. 359 at 296-298, 304 (testimony of Henry Cox of Box Trotters on usage in the early-to-mid 1990s); Dkt. 360 at 51 (testimony of Joe Schoen of U-Haul on U-Haul's usage of 'pod' in the 1980s in connection with U-Haul's Mover's World project). None of the witnesses offered any documentary support for their claims, and PODS raised issues of credibility based on each witness' alleged past infringement or interest in the outcome of this lawsuit.

(*See* Dkt. 359 at 179, 189-190, 194, 197, 300, 304; Dkt. 360 at 7, 51). Therefore, the jury could have fairly ascribed little or no weight to this testimony.

### g. Plaintiff's Generic Use

Finally, U-Haul argued that Plaintiff's use of the words 'pod' and 'pods' to refer to its containers before the registration of the trademark was evidence that the words were generic *ab initio*. *See* DX 5.06 (PODS information sheet referring to 1997 containers as "pods" before the PODS brand was created). (*See also* Dkt. 345 at 95, 104). U-Haul also offered evidence that Plaintiff used 'pod' generically, especially soon after the first trademark registration. *See* DX 6.08-09 ("Put it in a Pod" slogan); DX 25 at 122 (Pete Warhurst's testimony about 'pod' in a different trial); DX 26 (posters created by PODS using 'pod' as a noun for container); DX 75-76 (posters used by PODS translating 'pod' as "contenedor" in Spanish.). Plaintiff contends that even if its executives occasionally used the terms generically, there was no risk of consumer confusion. (*See, e.g.*, Dkt. 345 at 63-64 (Warhurst testimony)).

In *Welding Services*, the plaintiff seeking protection for its mark repeatedly used the same words it sought to protect generically, even in its statements to the district court and to refer to competitors' products. 509 F.3d at 1359. The Eleventh Circuit explained that a "would-be proprietor's use of the words in the mark to refer to the kind of services it and its competitors provide is powerful evidence that the words in the putative mark are being used generically." *Id.* Here, however, all of Plaintiff's allegedly generic use was in reference to its own products, not to the products of competitors. Even if the jury was compelled to give the generic use some weight, it could have reasonably credited Plaintiff's testimony that any generic use was shorthand and did little to undermine the distinctiveness of the PODS marks or change the primary significance of the terms

for the relevant consuming public.

### 2.   *PODS' Evidence Against Genericness*

While PODS did not introduce expert testimony of a linguist to rebut U-Haul's claim of genericness *ab initio*, it did offer lay testimony that the word 'pod' was not commonly used in the moving and storage industry prior to its trademark registration. PODS founder Pete Warhurst testified that he researched the name 'pods' and it was not used in the moving industry before PODS was founded, and that customers did not associate the term with the moving industry in the company's early years. (Dkt. 345 at 15-18, 56-57, 69-70). Phil Davis, the consultant who coined the name PODS for the company, also testified 'pods' was not used in the moving industry prior to the company's registration of its first trademarks in1998, and that customers did not use the term 'pods' for moving containers. (*Id.* at 137-144, 157, 161-165, 170-171). Other PODS witnesses offered similar testimony in court. (*See* Dkt. 356 at 173, 185 (testimony of PODS franchisees Robert Eales and Wesley Mullins)). Indeed, U-Haul witness Randy Weissman, the founder of an industry trade group, the Mobile Self-Storage Association, said he did not know of any use of 'pod' or 'pods' in the industry before 1998. (Dkt. 359 at 291-292). Believing this testimony and not crediting contradictory testimony that U-Haul offered was well within the jury's province as the finder of fact and arbiter of credibility.

As PODS contends, the jury was entitled to give weight to U-Haul's failure to introduce evidence that the term 'pod' was used before 1998 in the moving industry. U-Haul introduced evidence that U-Haul's Mover's World product, sold in the 1980s, was in concept and design much like the later PODS-branded products. But U-Haul was unable to produce documentary or other contemporaneous evidence that Mover's World, or any competitor before the entry of PODS into

the market, called its containers 'pods.' *See, e.g.*, DX 466.64, 466.89. The jury could have reasonably found that the evidence demonstrating that before the registration of the trademarks in question, competitors used terms other than 'pods' "tends to prove that the term is not generic." *E.T. Browne Drug Co. v. Cococare Products, Inc.*, 538 F.3d 185, 198 (3d Cir. 2008).

Finally, the jury reasonably could have placed significant weight on the fact that PODS' mark had reached incontestable status. The Fourth Circuit has held that "the PTO's decision to register a mark . . . is powerful evidence that the registered mark is suggestive and that a district court should receiv[e] the certificate of registration into evidence and treat it as prima facie evidence of the validity of the mark." *Freebies*, 364 F.3d at 543 (quotation and alteration omitted). While U-Haul argues the decision of the PTO was not entitled to any weight or deference, this overstates the law. Although the jury was not required to follow the PTO's decision,[6] and courts have overturned incontestable trademarks, the cases cited by U-Haul do not compel a finding that the jury could place no weight on the PTO's decision just because evidence of genericness was introduced. *See id.* at 548; *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221 (3d Cir. 2000) (court's discretion to weigh importance of PTO's decision); *Dixie Consumer Products LLC v. Huhtamaki Americas, Inc.*, 691 F. Supp. 2d 1372, 1375 n.2 (N.D. Ga. 2010) (same). Here, the PTO granted registrations to Plaintiff four times, as early as 1998, and the jury was entitled to consider this in addressing U-Haul's affirmative defense. *See* PX-1, PX-2, PX-9, PX-10.

### 3.    *U-Haul Failed to Carry Its Burden*

The Court's inquiry on a Rule 50 motion based on the sufficiency of evidence is limited to

---

[6] The jury instructions stated: "Notwithstanding the registration of a trademark, if one accused of trademark infringement proves by a preponderance of the evidence that the trademark was generic when registered or is generic today, a jury may find that the registered trademark is invalid." (Dkt. 341 at 14-15; *see id.* at 15).

determining "if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks*, 256 F.3d at 1246. It is the jury's role, not the court's, to make credibility determinations and weigh the evidence. *Reeves*, 530 U.S. at 150-151. As outlined above, U-Haul presented a significant amount of evidence relevant to its affirmative defense of genericness. However, a careful review of the evidence, in light of the relevant legal standards and the jury's role as finder of fact and appraiser of credibility, leads to the conclusion that there is sufficient evidence to support the jury's verdict. *See Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1348 (11th Cir. 2007) (denying Rule 50 motion brought by party who bore the burden of proof, where the movant made a prima facie case but there was sufficient evidence to support the jury's verdict); *Collado v. United Parcel Service, Co.*, 419 F.3d 1143, 1154 (11th Cir. 2005). U-Haul's remaining arguments for overturning the jury's verdict are similarly unavailing.

U-Haul urges that the evidence demonstrated 'pod' was a generic term for a container for the transportation and storage of goods, and that use of the term in the moving and storage industry need not be considered. There is authority for U-Haul's position that generic use in one context renders a term generic in other contexts. *See Clipper Cruise Line, Inc. v. Star Clippers, Inc.*, 952 F.2d 1046, 1048 (8th Cir. 1992) (term 'clipper' is generic for fast sailing ship is similarly generic when applied to cruises on sailing ships); *Miller Brewing*, 562 F.2d at 81 (use of 'light' in reference works and various industries makes the word 'lite' generic when applied to beer); *W.R. Grace*, 581 F. Supp. at 153; *Eastern Air Lines*, 559 F. Supp. at 1275. However, to adopt U-Haul's position in this case would require drawing inferences from the evidence that the jury declined to draw. *See Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 571 F.3d 1143, 1145 (11th Cir. 2009) (court must not substitute its own inferences from the evidence in place of reasonable inferences made by the

jury).

In a related context, U-Haul argues that the relevant consuming public should not be limited to consumers of the moving and storage industry. Indeed, PODS' first registration with the PTO includes broad language about the relevant industry. *See* PX-1 ("FOR: METAL CONTAINERS FOR THE STORAGE AND TRANSPORTATION OF GOODS"). U-Haul's position has some support in the case law, including those cases cited by PODS. *See Magic Wand*, 940 F.2d at 641 (rejecting narrow definition of relevant public); *Burger King*, 705 F. Supp. at 1525 (same). However, the key point remains that even if the relevant public encompassed a broader group than PODS contends, the uncontested evidence did not require the jury to find 'pod' and 'pods' was generic for the products in question.

## IV.   MOTION FOR NEW TRIAL

For the same reasons, U-Haul's motion for a new trial fails. A Rule 59 motion for a new trial based on evidentiary grounds should be granted only if the verdict "is against the clear weight of the evidence or will result in a miscarriage of justice." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) (quotation omitted). "Because it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotation omitted). Indeed, when a district court grants a new trial based on the weight of the evidence, the Eleventh Circuit engages in an "extremely stringent" standard of review to ensure the district court "does not simply substitute its own credibility choices and inferences for the reasonable choices and inferences made by the jury." *Auto-Owners*, 571 F.3d at 1145. *See Redd v. City of Phenix City, Ala.*,

19

934 F.2d 1211, 1215 (11th Cir. 1991) ("When there is some support for a jury's verdict, it is irrelevant what we or the district judge would have concluded.").

As explained above, the jury's verdict was supported by sufficient evidence and reasonable inferences from the evidence. Therefore, the jury's verdict is not contrary to the great weight of the evidence. "[B]ecause it is not our place to substitute our judgment for that of the jury," the motion for a new trial must be denied. *Auto-Owners*, 571 F.3d at 1145.

V.   **CONCLUSION**

Accordingly, U-Haul's Renewed Motion for Directed Verdict, for Judgment as a Matter of Law, Or in the Alternative, Motion for New Trial (Dkt. 348) is **DENIED**.

The Clerk is **DIRECTED** to enter final judgment in favor of PODS and against U-Haul in accordance with the jury verdict (Dkt. 337), and to **CLOSE** this case.

**DONE AND ORDERED** this __10th__ day of March, 2015.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record